[No. B149294. Second Dist., Div. Four. Nov. 20, 2001.]

In re JESSICA G. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent;
HERMILA A., Defendant and Appellant.

## COUNSEL

Craig E. Arthur, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd W. Pellman, County Counsel, and Lois D. Timnick, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, J.**—This is a dependency appeal by Hermila A., the mother (Mother) of the two minor dependents in the case, Jessica G. and Maria G. We follow the recent decision of the Fifth District Court of Appeal in *In re Sara D.* (2001) 87 Cal.App.4th 661 [104 Cal.Rptr.2d 909], and conclude that Mother's due process rights were violated by the trial court's appointment of a guardian ad litem. We reverse.

### FACTUAL AND PROCEDURAL SUMMARY

The appeal is taken from an order terminating parental rights, made under section 366.26 of the Welfare and Institutions Code. (Further statutory citations are to that code unless another is indicated.) Two children are involved.

The initial petition was filed under section 300, in June 1999. It asked the court to assert dependency jurisdiction over two children, Jessica G. and

J.C.G. (JC). At the time, the children were, respectively, five years and two and one-half years old. The petition alleged that both were exposed to violent confrontations and other domestic disturbance between Mother and Juan G., the man with whom she was living. Juan G. is the father of JC. There were allegations of sexual abuse and threats by Juan G. against Jessica. It also was alleged that JC suffered from myoclonic encephalopathy which requires medical treatment, and that Mother was neglecting his needs by failing to refill the child's prescriptions. His status is not before the court in this appeal.

The initial dependency hearing was conducted the day after filing. Counsel was appointed for Mother at the proceeding. Mother was assisted then, and at all court proceedings, by a qualified Spanish language interpreter. The court asserted jurisdiction, and gave temporary custody of the children to the Los Angeles County Department of Children and Family Services (the Department), which was authorized to release them to Mother provided she obtain a new residence that was confidential as to Juan G. After that, the case followed the familiar course of dependency proceedings, at which periodic reviews are prepared and hearings held as the case proceeds slowly toward resolution.

A second dependency petition was filed later in June 1999, upon the birth of Maria G., the third child born to Mother, and the second dependent in this appeal. The allegations were similar to those in the previous petition, except that it added that Maria was born with a positive toxicology screen. The court asserted dependency jurisdiction over this child as well. A few months later, specialized medical treatment was ordered for JC.

The social study reports and other information periodically given to the court displayed efforts by Mother to comply with plans and programs designated for her by the Department. Her compliance generally was less than satisfactory. She enrolled in programs but did not complete them; she tested negative for narcotics, but did not always test. She had difficulty finding a suitable residence. And she reported continual physical abuse by Juan G., with attendant fear. There were reports that Juan G. resumed living with Mother at times. Mother was afraid of notifying authorities of his presence because he hurt her and carried a knife. Jessica confirmed Juan G.'s violent attacks on Mother. Juan G. also was a drug user. On one occasion, Mother stood on railroad tracks, refusing to move, and suffered injuries when struck by an oncoming train. Mother kept her visitation appointments with the children, except when she was hospitalized as a result of injuries suffered from the train incident. She was affectionate and concerned about their welfare.

A report prepared for the six-month review hearing in March 2000 stated that Mother intended to enroll in parenting classes; had not enrolled in domestic violence classes because of lack of funds; had tested negative for drugs; and was dedicated to regaining custody of her children, with whom she continued to visit. Shortly after that, it was reported that she had returned to a cruelty prevention program, and had enrolled in parenting, individual therapy and domestic violence classes, as well as a drug awareness program. A psychological evaluation reported that she cared deeply about her children. It recommended that she have continued monitored visitation with them, although reunification was considered unlikely. The court found that return of the children to Mother would be detrimental, that Mother was not complying with the reunification plan, and that there was no substantial probability that the minors would be returned to her if she were given an additional six months of reunification services. The court terminated reunification services, and scheduled a permanency planning hearing for July 2000.

The report prepared for that hearing stated that Jessica remained at the foster home where she had resided since becoming a dependent, that Maria was at another home, and JC at still another. Mother continued her visitations, but her program attendance was irregular. She had been hospitalized for fainting and bronchitis. The social worker believed Jessica to be adoptable, although Jessica did not want to be adopted and her foster parents did not want to adopt her. Maria's foster parents were interested in adopting her. The social worker recommended long-term foster care for all three children, and monitored visitation by Mother.

At the July 2000 hearing, the matter was put over until January 2001 due to lack of notice to the fathers. The Department was ordered to try to find an adoptive home for Jessica and Maria, and monitored visits by Mother were to continue. Mother kept those visits, and Jessica was now more attached to her than before. But Jessica still did not want to live with Mother because she was afraid of Juan G.. By then, Jessica and Maria were in the same foster home. Mother had been hospitalized twice in December 2000, once for depression and again for breathing problems. Her class attendance was sporadic, but marginal progress was noted. She received a certificate for attending a year of parenting classes. When she visited the children she was loving toward them and brought small gifts. Jessica would play with her, but Maria ignored her.

Mother appeared at the January 12, 2001 hearing, as she had at the other hearings. The court put the section 366.26 hearing over until March (and later, to April). It was at the January 2001 hearing that a guardian ad litem

was appointed for Mother. Mother appeared at the April hearing, with both her attorney and the guardian ad litem. Testimony was taken, after which the court made a section 366.26 order terminating Mother's parental rights. She filed a notice of appeal from that order on April 10, 2001.

## DISCUSSION

 On appeal, Mother argues that the appointment of a guardian ad litem violated her constitutional due process rights; that it was not supported by substantial evidence; and, on the merits, that the trial court erred in failing to find a "benefit exception" under section 366.26, subdivision (c)(1)(A). Only the first of these claims requires discussion, since it is dispositive.

There is very little case law on appointment of a guardian ad litem for an adult parent in the context of dependency proceedings. *In re Sara D., supra*, 87 Cal.App.4th 661 (*Sara D.*) is an exception. We follow the thorough and persuasive analysis of that case.

*Sara D.* arose out of a guardian ad litem appointment made at a dispositional hearing. (*Sara D., supra*, 87 Cal.App.4th at pp. 663-665.) The need for an appointment had been discussed between the court and counsel in chambers, outside the mother's presence, and almost nothing beyond the bare appointment order occurred in open court. (*Id.* at p. 664.) As we shall discuss, the circumstances of *Sara D.* differ from the case before us only in form.

 The general authority for appointment of a guardian ad litem is Code of Civil Procedure section 372. That statute does not explicitly discuss the grounds for appointment, beyond a requirement that it be "expedient." Instead, the provision concentrates on the kinds of persons for whom a guardian may be appointed (minors, incompetents, conservatees), and the authority of the guardian. The bases for appointment are treated in two other statutes, Probate Code section 1801 and Penal Code section 1367.

The *Sara D.* court concluded that either of these laws may apply to dependency proceedings. (*Sara D., supra*, 87 Cal.App.4th at p. 667.) Whichever is used, the basis for appointment is incompetence of the parent for whose benefit it is to be made. The test for incompetence in this context is whether the party has the capacity to understand the nature or consequences of the proceeding, and is able to assist counsel in preparation of the case. (*Id.* at p. 666, citing *In re Christina B.* (1993) 19 Cal.App.4th 1441, 1450 [23 Cal.Rptr.2d 918].)

 The introduction of a guardian ad litem into the case is no small matter. The effect of the appointment is to remove control over the litigation

from the parent, whose vital rights are at issue, and transfer it to the guardian. Consequently, the appointment must be approached with care and appreciation of its very significant legal effect. "The court is being asked to dramatically change the parent's role in the proceeding by transferring the direction and control of the litigation from the parent to the guardian ad litem." (*Sara D., supra*, 87 Cal.App.4th at p. 668.) The guardian ad litem has broad powers: "the power to control the lawsuit, including controlling procedural steps necessary to the conduct of the litigation . . . and controlling trial tactics." (*Ibid.*) Because "the decisions made can affect the outcome of the dependency proceeding, with a corresponding effect on the parent . . . the parent has a direct and substantial interest in whether a guardian ad litem is appointed." (*Ibid.*)

These fundamental parental rights are protected by due process: a parent cannot be deprived of the right to exercise all the powers of a client, and to assist counsel, without due process of law. "Transferring direction and control of the litigation through appointment of a guardian ad litem in a dependency proceeding may jeopardize the parent's interest as much, if not more, than any of the actions taken in [custody cases, in which due process rights are recognized]. Therefore, . . . [the parent] was entitled to due process before the court appointed a guardian ad litem for her. In reaching this conclusion we are also influenced by the breadth of the due process protections statutorily provided the parent throughout section 300 cases. If a court can transfer the direction and control of the litigation from the parent without due process, the remaining protections seem hollow." (*Sara D., supra*, 87 Cal.App.4th at p. 669, fn. omitted.)

Thus, the appointment vitally affects the parent's interest in the companionship, care, custody and management of her or his children, one of the most basic of civil rights. "Before the state can deprive a parent of this interest, it must provide the parent with a hearing and an opportunity to be heard." (*Sara D., supra*, 87 Cal.App.4th at p. 668.) This is, of course, the essence of procedural due process.

What process is due? If the parent's counsel believes that a guardian ad litem should be appointed, that attorney has two alternative courses to follow. One is to approach the client and ask for consent. If consent is given, due process is served since the parent will have participated in the decision. The other alternative, where the client does not consent or is not consulted, is for the attorney to approach the court directly. (*Sara D., supra*, 87 Cal.App.4th at p. 668.)

That option requires notice and hearing. This does not mean that a formal noticed motion with attendant briefing is required; "A formal hearing was

not necessary." (*Sara D., supra,* 87 Cal.App.4th at p. 672.) What is required is that the court or counsel explain to the parent/client the purpose of the guardian ad litem appointment, the authority the guardian will have (and which the parent will not have) in the litigation, and why the attorney believes the appointment should be made. Persons other than court attachés, the parent and the parent's attorney may be excluded from the courtroom during the hearing. At the hearing, the parent should be given the opportunity to respond—"to present the best case and provide the court with the most accurate picture of the circumstances so that it can make an informed decision." (*Ibid.*) This may involve testimony on the limited issue of competency. "At a minimum, the court should make an inquiry sufficient to satisfy it that the parent is, or is not, competent; i.e., whether the parent understands the nature of the proceedings and can assist the attorney in protecting his/her rights." *(Ibid.)* The court's decision on this issue should be stated on the record.

 With these principles in mind, we turn to what actually happened in this case. The appointment occurred on January 12, 2001, the date noticed for the section 366.26 hearing. After discussion of various logistical matters concerning a continuance of the hearing, and an order for special treatment of the disabled minor, JC, the following colloquy occurred between Mother's attorney, Deborah Blanchard, and the court:

"Ms. Blanchard: Your Honor?

"The Court: Yes.

"Ms. Blanchard: This is a little belated. But due to my continuing perception that the mother does not comprehend what is occurring here today, I would request that a G.A.L. be appointed on—that a G.A.L. be appointed on her behalf.

"The Court: Has the mother ever had a psychological evaluation?

"Ms. Blanchard: There's—there was one done—there was one done last year.

"The Court: There has to be a medical basis for coming up with a G.A.L., either it's apparent in the reports or it comes across in the psychological or psychiatric evaluation. I'll appoint a G.A.L. for the mother. I'll appoint somebody today. You can take back your report.

"Ms. Blanchard: Thank you."

(The clerk's transcript for the January 12, 2001 hearing does not reflect appointment of a guardian ad litem, but this oversight was corrected, nunc pro tunc, at a hearing on March 1, 2001. The nunc pro tunc order states that Marilyn Mordetsky was appointed as guardian ad litem on January 12, 2001. The bench officer who presided at the January 12 hearing, and who made the appointment, is Referee Irwin Garfinkel. The judge who made the nunc pro tunc order and section 366.26 order is Diana M. Wheatley.)

There is nothing in the record to suggest that anyone explained to Mother that "G.A.L." stands for guardian ad litem, or what the appointment means in general and what it would mean to her. The court made no inquiry whatever of Mother to ascertain whether she was competent in the sense of being able to understand the proceeding and to assist her attorney. It may be, as the Department suggests, that there was sufficient evidence in the record to support an inference that she was not competent in this sense. (The transcript suggests that Ms. Blanchard handed up some kind of report to the court, which it returned.) But the Department made no effort to demonstrate that this information, whatever it is, was sufficient. Even if it were, absent countervailing information, it would not obviate the necessity for the court to make an inquiry and finding on the record. We note that when Mother testified at the section 366.26 hearing in April 2001, her testimony was coherent, responsive and focused. She acknowledged emotional difficulties, but her testimony does not demonstrate any kind of incompetence as a party.

We turn to the question of prejudice. The issue on appeal is not whether it is probable that the losing party would have achieved a better result but for the error, but the federal constitutional standard: whether the error is harm-less beyond a reasonable doubt; for unless it is, the resulting adjudication must be reversed. (*Sara D., supra,* 87 Cal.App.4th at p. 673.) As in *Sara D.,* we cannot say that standard is satisfied. We do not know what Mother might have done or suggested to her attorney if the guardian ad litem had not been interposed. She may have had supportive witnesses to testify about her performance at programs and in support of a continued relationship with her daughters, under section 366.26, subdivision (a)(1)(A); or she may have suggested that she finally had rid herself of Juan G. and experienced an improvement in her psychological prospects as a result; and she may have been able to suggest other evidence or leads. Or she may not have been able to offer anything helpful. We simply do not know.

The Department seeks to distinguish *Sara D.* As we have discussed, in that case the decision to appoint a guardian ad litem was taken in chambers in the absence of the parent. In this case, the discussion, such as it was, was in open court. But it was in code. Both court and counsel kept referring to

appointment of a "G.A.L." without explanation of what that is. As in so many dependency cases, the court and counsel use a sort of shorthand made up of abbreviated case names and even more abbreviated statutory references (e.g., a ".26 hearing"), and other terms of art (e.g., "units," which to the initiated denotes the number of time segments necessary to hear a matter). That may be sufficient as between them, but it ordinarily is totally uninformative to the parent whose rights are at issue.

■ That takes us to the Department's principal argument for affirmance. It invokes the so-called waiver rule: that since Mother did not file a writ application challenging the previous appointment of the guardian ad litem, she cannot be heard to complain about that order on appeal from the final order terminating parental rights.

The waiver rule is indeed the general rule. (See § 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B; *In re Meranda P.* (1997) 56 Cal.App.4th 1143 [65 Cal.Rptr.2d 913].) But it is not the universal rule. The crux of *Meranda P.*, a leading case on the point, is that "the waiver rule will be enforced unless due process forbids it." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 208 [87 Cal.Rptr.2d 634].) We already have pointed out that the order violated Mother's due process rights. The Department argues that she should have done something about it then, by taking a prompt writ. (Cal. Rules of Court, rule 39.1B(f).)[1]

How could Mother have done so? Her attorney looked to the guardian ad litem, and that person could hardly be expected to endorse a writ questioning the legality of her appointment. Mother was in a Catch-22 situation in which she had a bare remedy with no real knowledge or ability of how to use it and no attorney to whom she could turn to effect it. Insisting that she take a writ at that point or lose her right to later complain about violation of her constitutional rights would itself pose constitutional issues.

---

[1] We note that the rule requires that the parent be notified of the need to seek writ relief as a prerequisite to late appellate challenge to an intermediate order. The March 16, 2000 order recites that the judicial assistant "personally notices the mother of her writ of appeal rights." The reporter's transcript for that hearing includes a recitation by the court that "the mother is being served with notice of writ and appeal rights." That hearing was almost a year before the hearing at which the guardian ad litem order was made. We are not furnished with a copy of the written advisement given the Mother (or whether it was written in Spanish). We particularly do not know whether the advisement adequately covered the necessity of seeking writ review of subsequent orders. Even if the advisement was adequate (see Evid. Code, § 664, establishing a rebuttable presumption that official duty is regularly performed), the due process exception applies.

## DISPOSITION

The order terminating parental rights and the order appointing a guardian ad litem are reversed and the case is remanded for further proceedings consistent with this opinion.

Vogel (C. S.), P. J., and Curry, J., concurred.

A petition for a rehearing was denied December 19, 2001, and the opinion was modified to read as printed above.