[No. B175094. Second Dist., Div. Four. May 5, 2005.]

In re C. G., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
C. G., Defendant and Appellant.

**COUNSEL**

Andre F. F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond Fortner, County Counsel, Larry Cory, Assistant County Counsel, and Pamela Landeros, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, P. J.**—In this appeal, mother C. G. (mother) challenges the court order appointing a legal guardian for her daughter C. G. (C. G.), in part because the court improperly appointed a guardian ad litem to act for mother in the dependency proceedings. We conclude the guardian ad litem appointment violated mother's due process rights and requires reversal of the underlying order.

## FACTUAL AND PROCEDURAL SUMMARY

C. G. was detained by the Los Angeles Department of Children and Family Services (DCFS) in September 2002. Her mother and father were using drugs and were not properly supervising the child. On numerous occasions, father

drove while under the influence of alcohol, with C. G. in the car. Mother knew about this conduct, but did not stop him. In addition, the family home was "in a filthy and unsanitary condition."

At the detention hearing in September 2002 (Welf. & Inst. Code, § 300, subds. (b) & (c)),[1] at the suggestion of mother's counsel, the court appointed Henry Parks as mother's guardian ad litem. The court relied on a report from DCFS, which stated that, according to mother, she has cerebral palsy and was a client of South Central Los Angeles Regional Center for Developmental Disabilities (Regional Center). Mother also disclosed that she and her husband have developmental disabilities, and she was seeing a psychiatrist. The court ordered C. G. to be detained in foster care and granted mother unmonitored visits with C. G.

According to an October 2002 DCFS report, both parents said they are mentally retarded. The Regional Center, where mother had been a client since 1980, sent a letter confirming that she had been diagnosed with mild mental retardation. Mother also said father had the mind of a three year old and may be autistic. The social worker described "parents' level of functioning [as] unknown at this time," and suggested parents needed help with personal hygiene and budgeting their income.

In October 2002, the court ordered family reunification services for parents. The court also ordered monitored visits for parents, a minimum of once a week. In a December 2002 hearing, mother told the court she had seen C. G. only once.

The court conducted a jurisdictional hearing in March 2003. It inquired if mother had reviewed a form for waiver of trial rights. Parks, the guardian ad litem, said he understood the form, went over it with mother, and signed it on her behalf. The court warned that it probably would find the petition true if parents waived a hearing, and Parks responded that he understood. Mother's counsel joined in the waiver, which the court then accepted. The court also accepted father's waiver, but only after inquiring at length about father's understanding of the waiver.

The court then sustained the allegations against parents, finding that they failed to maintain a clean home for C. G., that they had a history of substance

---

[1] All statutory references are to this code unless otherwise stated.

abuse, and were current users of drugs. The court also found C. G. was a person described by section 300, subdivision (b). The court ordered psychological evaluation of parents and C. G.

During the hearing, mother expressed concern over the monitored visits. She did not feel comfortable visiting her daughter while under the observation of the foster mother. The court reassured her that the psychological evaluation would help determine how to conduct future visits.

In May 2003, the court ordered that the parents' visits with C. G. occur in a therapeutic setting. Mother expressed concern. She said she had tried to tell her lawyer she was not happy with the way the case was progressing, but "I'm not getting anywhere." "I don't like what they're doing. I feel people laughing [sic] at me that I don't know what to say."

The court-appointed psychiatrist made his report in May 2003. He concluded parents suffered from mild mental retardation. He described parents as pleasant and cooperative, and noted they spoke "in a basically logical and coherent manner . . . ." Parents denied the allegations against them, and they were "quite upset about this case situation and insist that they have been viewed and treated very unfairly by the system." After reviewing the allegations against parents, the psychiatrist concluded, "I frankly think it is possible that DCFS and the minor's therapist may be viewing these parents overly negatively . . . ." Still, given C. G.'s resistance to contact with her parents, the psychiatrist recommended guardianship or long-term foster care and therapy for C. G. and parents.

In July 2003, the court held hearings regarding the foster family's planned vacation to Mexico and mother's visits with C. G. Mother objected to the trip, fearing something would happen to her daughter. She also was concerned about how the trip would affect her visits with C. G., noting she had not been able to visit her daughter for several months. Mother expressed her frustration over not being allowed to state her opinion, and told the court she felt "left out." The court encouraged her to discuss her concerns with Parks and her attorney.

In August 2003, the court declared C. G. a dependent child of the court under section 300, subdivision (b). The court ordered family reunification services for both parents, and granted mother monitored visits with C. G. in a therapeutic setting. The court also ordered counseling and random drug testing for parents.

Over the next three months, parents did not comply with reunification services, failed drug tests and became homeless. C. G. refused to visit with her parents. Father passed away in January 2004.

Mother entered a drug treatment program and counseling for parenting skills and domestic violence, which were all required in the case plan. Even though she had "partially complied" with the plan, in January 2004, the court terminated family reunification services and ordered permanent placement services. In May 2004, the court appointed foster mother as C. G.'s legal guardian. Mother filed this timely appeal.

## DISCUSSION

On appeal, mother argues the appointment of a guardian ad litem violated her constitutional due process rights and that it was not supported by substantial evidence. We only discuss the first claim, since it is dispositive.

█ As applied to dependency cases, section 372 of the Code of Civil Procedure requires that if a party is incompetent under Probate Code section 1801 or Penal Code section 1367, he or she shall appear by a guardian ad litem appointed by the court. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 667 [104 Cal.Rptr.2d 909].) "The test for incompetence in this context is whether the party has the capacity to understand the nature or consequences of the proceeding, and is able to assist counsel in preparation of the case." (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1186 [113 Cal.Rptr.2d 714].)

Appointment of a guardian ad litem "remove[s] control over the litigation from the parent, whose vital rights are at issue, and transfer[s] it to the guardian." (*In re Jessica G., supra,* 93 Cal.App.4th at pp. 1186–1187.) Because the legal effect of that appointment is so great, "the parent's due process rights must be protected before a guardian ad litem is appointed." (*In re Daniel S.* (2004) 115 Cal.App.4th 903, 912 [9 Cal.Rptr.3d 646].)

If the parent consents, due process is served. (*In re Daniel S., supra,* 115 Cal.App.4th at p. 912.) However, if the parent does not consent or is not consulted, the court must "explain to the parent/client the purpose of the guardian ad litem appointment, the authority the guardian will have (and which the parent will not have) in the litigation, and why the attorney believes the appointment should be made." (*In re Jessica G., supra,* 93 Cal.App.4th at p. 1188.) In addition, " 'the court should make an inquiry sufficient to satisfy it that the parent is, or is not, competent; i.e., whether the parent understands the nature of the proceedings and can assist the attorney in

protecting his/her rights.' " (*Ibid.*, quoting *In re Sara D., supra,* 87 Cal.App.4th at p. 672.)

Nothing in the record suggests that the nature of the appointment was explained to mother or that she had any idea what it was. Nor is there any indication that she consented to the appointment or was given an opportunity to state her position about it. The court simply appointed the guardian upon being asked to do so by the mother's attorney. The attorney provided no explanation as to why a guardian ad litem was appropriate. The court did not explain what the appointment meant in general or to mother, and it did not inquire whether mother's attorney had discussed the situation with her. (See *In re Jessica G., supra,* 93 Cal.App.4th at p. 1189.)

In addition, the court failed to adequately inquire regarding mother's competence. At the time of the appointment, the only evidence to suggest mother was incompetent was a DCFS report that repeated a statement by mother that she suffered from cerebral palsy and that she and father were clients of the Regional Center. The court relied on that report to determine a guardian ad litem appointment was appropriate, commenting "I note from the report that perhaps the mother could use the assistance of a guardian ad litem to represent her. So [Parks will] be appointed for that purpose." There was "no effort to demonstrate that this information . . . was sufficient" to show that mother was unable to understand the proceedings or assist her attorney. (See *In re Jessica G., supra,* 93 Cal.App.4th at p. 1189.) Respondent concedes the appointment was error.

█ We "[look] at the stage at which a particular constitutional error occurs in order to determine what standard of error review should be applied. 'Trial error' is error that occurs *during* the *presentation of the case.* [Citation.]" (*Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 555 [126 Cal.Rptr.2d 14].) Such an error is subject to the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Judith P., supra,* at pp. 554–555.) A " 'structural' error" involves " ' "*basic* protections, [without which] a criminal trial cannot reliably serve its function as a *vehicle* for determination of guilt or innocence, . . ." ' " (*Judith P.,* at p. 555, quoting *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246].) Although the structural error analysis explained in *Arizona v. Fulminante* arose in the context of a criminal case, it is appropriate to "rel[y] upon such [an] analysis in analogous situations in which the fundamental constitutional right to parent is the subject of some error." (*Judith P.,* at p. 554.) "Examples of such structural errors that result in automatic reversal . . . include total deprivation

of the right to counsel at trial, a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation at trial, denial of the right to a public trial, and an erroneous reasonable doubt instruction to the jury." (*Id.*, at pp. 555–556.)

In *Jessica G.*, we accepted an argument that the *Chapman* test applied to a nonconsensual appointment of a guardian ad litem without a hearing determining whether an appointment was appropriate. (*In re Jessica G., supra*, 93 Cal.App.4th at p. 1189.) In that case, we found the error was not harmless beyond a reasonable doubt. There was no way to "know what Mother might have done or suggested to her attorney if the guardian ad litem had not been interposed." (*Ibid.*) And, without a hearing, there was no way to determine if mother was indeed incompetent, let alone whether she understood the role of the guardian or objected to the appointment. (See *id.* at p. 1188.)

■ On further review, we conclude that, in the circumstances of this case (and *In re Jessica G., supra*, 93 Cal.App.4th 1180), the error is structural. The erroneous appointment of the guardian ad litem deprived mother of her status as a party in the case. We recognize that a party represented by counsel does not have absolute control over every element of his or her case. For example, a party's attorney " 'has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters'; in other words, 'counsel is captain of the ship.' " (*People v. Masterson* (1994) 8 Cal.4th 965, 969 [35 Cal.Rptr.2d 679, 884 P.2d 136].) But the parent in a dependency case still has much to say about basic strategy and tactical decisions. There are few cases in which more basic issues are at stake than the right to the companionship, care, custody, and management of one's own child. The parent has a right to be consulted, to express positions and interests, and, in some circumstances, to give or withhold consent to a course of action. The erroneous transfer of those powers to a guardian ad litem denies a parent the ability to participate substantively in the case. (See *In re Sara D., supra*, 87 Cal.App.4th at p. 668.) As the court pointed out in *Sara D.*, "a guardian ad litem has broad powers . . . . [T]he decisions made [by a guardian ad litem] can affect the outcome of the dependency proceeding, with a corresponding effect on the parent." (*Ibid.*, fns. omitted.) "If a court can transfer the direction and control of the litigation from the parent without due process, the remaining protections seem hollow." (*Id.* at p. 669.) There were instances in this case in which mother did express a position to the court, and the guardian ad litem's attorney may have kept her informed of what was going on in court, or even solicited her views. But he could as well not have done so, and instead taken policy direction from the guardian ad litem. The appointment of the guardian ad litem was structural error as explained in *Arizona v. Fulminante,* and reversal is required.

## DISPOSITION

The order placing C. G. under legal guardianship is reversed. The orders appointing a guardian ad litem and terminating jurisdiction are also reversed. The matter is remanded for further proceedings consistent with this opinion.

Hastings, J., and Grimes, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied August 10, 2005. Werdegar, J., did not participate therein.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.