[No. S150316. Jan. 17, 2008.]

In re JAMES F., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
MARCUS M., Defendant and Appellant.

COUNSEL

John L. Dodd, under appointment by the Supreme Court, and Ellen Forman Obstler, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, Larry Cory and James M. Owens, Assistant County Counsel, Frank J. DaVanzo, Principal Deputy County Counsel, and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer B. Henning; John J. Sansone, County Counsel (San Diego), John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for California State Association of Counties as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—In a dependency case (Welf. & Inst. Code, § 300 et seq.), the juvenile court may terminate a parent's interest in a child's companionship, care, and custody after the child has been removed from the parent's home, efforts to reunify the family have failed, and adoption has been identified as the permanent placement goal. (*Id.,* § 366.26, subd. (b)(1); see *In re Celine R.* (2003) 31 Cal.4th 45, 52–53 [1 Cal.Rptr.3d 432, 71 P.3d 787].) Because a basic civil right of the parent is thus at stake (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826]), significant due process safeguards have been built into the dependency scheme (*id.* at p. 307), including a right to court-appointed counsel for a parent who cannot afford to retain counsel (Welf. & Inst. Code, § 317).

In a dependency case, a parent who is mentally incompetent must appear through a guardian ad litem, to whom the parent yields management and control of the litigation. (*In re Daniel S.* (2004) 115 Cal.App.4th 903, 912 [9 Cal.Rptr.3d 646]; *In re Sara D.* (2001) 87 Cal.App.4th 661, 665–667 [104 Cal.Rptr.2d 909].) Before appointing a guardian ad litem for a parent in a dependency proceeding, however, the juvenile court must hold an informal hearing at which the purpose and powers of a guardian ad litem and the reasons for believing the parent incompetent are explained to the parent and, if the parent does not consent to the guardian ad litem's appointment, the parent is given an opportunity to argue that a guardian ad litem is not required. (*In re Sara D., supra,* at pp. 663, 671–672.)

At issue here is whether, as the Court of Appeal concluded, a juvenile court's error in the procedure used to appoint a guardian ad litem for a parent

in a dependency proceeding requires automatic reversal of an order terminating the parent's parental rights, or whether instead the error is subject to harmless error review. We conclude that the error may be harmless and was so here. Accordingly, we reverse the Court of Appeal's judgment.

## I

James F. was born on July 11, 2003. His mother is Cynthia F. and his father is Marcus M. On September 11, 2003, when James was two months old, the Los Angeles County Department of Children and Family Services (Department) removed him from his parents' custody and placed him with a foster family.

On September 16, 2003, the Department filed a petition alleging that James F. came within the juvenile court's dependency jurisdiction because he had suffered, or there was a substantial risk that he would suffer, serious physical harm or illness as a result of his mother's failure or inability to supervise or protect him and because, due to his mother's substance abuse, she was unable to provide regular care for him. (Welf. & Inst. Code, § 300, subd. (b).) On the same day, the juvenile court held a detention hearing (*id.,* § 315). The court appointed attorneys to represent James, mother Cynthia F., and father Marcus M. The court found a prima facie case and ordered James detained in the Department's custody.

On October 9, 2003, the Department filed an amended petition containing additional allegations. Of relevance here, the Department alleged in the amended petition that Marcus M. had been diagnosed with bipolar disorder, that this disability "endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage," and that Marcus "has demonstrated numerous emotional and mental problems" rendering him "unable to regularly care for [James]." In a report filed the same day, the Department stated that Marcus had "an extensive criminal history" that included a felony conviction in June 1998 for aggravated assault on a police officer (Pen. Code, § 245, subd. (c)); that he had been admitted to Patton State Hospital in November 1998 and again in November 2000 after being found incompetent to stand trial (*id.,* § 1370); that he "appeared agitated, unstable, and unpredictable" when a Department social worker attempted to interview him at his father's house on September 25, 2003; that he was "incoherent" during a telephone conversation with a social worker on September 26, 2003; that he "appeared anxious, edgy, and even scared" and "seemed to have difficulty just staying calm and focused" when interviewed at a Department office on September 29, 2003; and that his father reported that Marcus had been diagnosed with bipolar disorder.

At a hearing on October 9, 2003, parents Marcus M. and Cynthia F. denied the amended petition's allegations, and the juvenile court set the matter for a contested jurisdictional hearing on December 1, 2003. On October 23, 2003, the superior court, in a separate proceeding, appointed Marcus's parents conservators of his person. (See Prob. Code, § 1801, subd. (a).)

In a report prepared for the jurisdictional hearing, the Department stated that it had subpoenaed and reviewed Patton State Hospital's mental health records relating to Marcus M. According to the report, the hospital records indicated that Marcus "suffers from severe psychological problems, and his behavior has improved while prescribed a steady regimen of psychotropic medication." At the hearing on December 1, 2003, Marcus was not present, and the juvenile court received information that he was in custody on a charge of robbery (Pen. Code, § 211). The court put over the jurisdictional hearing to a later date.

On December 16, 2003, Marcus M. appeared in juvenile court for the jurisdictional hearing with his appointed attorney, Linda Nakamura. Attorney Claudette Boehm told the court she was "available for appointment" as a guardian ad litem for Marcus, and the court replied, "You will be appointed." The court announced that all parties had agreed to submit the matter on the Department's reports. The court then addressed Marcus, showing him a document that would waive his rights to a trial, to cross-examine witnesses, to compel witnesses to come to court, and to testify on his own behalf, and also waiving the privilege against self-incrimination. When the court asked whether Marcus agreed "to give up all of those rights," he replied: "Yes. Yes. Why, no, I don't think that's right, your Honor, because I want a trial, because I want to get my baby back." The court assured Marcus that "[t]hey are going to give you services to try to help you get the child back" and that "[b]y entering a plea, we are going to take jurisdiction over your case, and I am going to be ordering the Department to provide services for you to try to help you get the child back." Marcus agreed he wanted that to happen. His attorney joined in the plea, concurred in the waivers, and stipulated to a factual basis for jurisdiction. The court accepted Marcus's plea to the amended petition, found the allegations of that petition true, and declared James F. to be a dependent of the court.

The attorney representing James F. expressed concern over "whether or not the record is sufficient to warrant an appointment" of a guardian ad litem and whether Marcus M. was competent to waive his trial rights. Marcus's attorney volunteered to "make a record" and began to question him, as follows:

Ms. Nakamura: "Mr. [M.], do you need help today working on your case? Do you need to have two attorneys instead of one?"

Marcus M.: "Yes."

Ms. Nakamura: "Does it help you to have another attorney help you with your case?"

Marcus M.: "I understand."

Ms. Nakamura: "Does it help you to have another attorney help you with your case? Did you like having another attorney help you understand?"

Marcus M.: "Yes. Yes."

James F.'s attorney objected that this was not the proper inquiry, and the juvenile court permitted him to question Marcus M., as follows:

James F.'s attorney: "Mr. [M.], do you know what you are here for today?"

Marcus M.: "For my children, to get my son back."

James F.'s attorney: "Do you know that today was set for a trial of the issues in this case that you are alleged, things that you have been alleged to have done?"

Marcus M.: "Oh."

The attorney for the Department commented that Marcus M. appeared to be looking to his relatives for cues. The juvenile court said it had decided to continue the matter to give Marcus's attorney and guardian ad litem more time "to confer and to discuss this proceeding further" with Marcus, who then asked the court, "What is the GAL [guardian ad litem]?" The court replied, "That's Ms. Boehm, your second lawyer." James F.'s attorney suggested a hearing in chambers to determine whether Marcus needed a guardian ad litem. The juvenile court replied: "I think I can fairly say that he's in a position or a condition where a [guardian ad litem] would be to his benefit" and "[t]hat finding I would make today." The court struck Marcus's plea to the allegations of the amended petition.

On December 19, 2003, the Department placed James F. in the home of his maternal grandparents. In a report filed on March 10, 2004, the Department reported that Marcus M. remained in custody on criminal charges and was scheduled for transportation to Patton State Hospital. On the same day, Claudette Boehm, as Marcus's guardian ad litem, signed a document waiving his right to a trial and submitting the jurisdictional issues on the social workers' reports and other documents. At a juvenile court hearing held that

day, Boehm told the court that she executed the document because she thought it would be beneficial for Marcus, who was "being offered family reunification services," and that "his current functioning doesn't really allow him to sign that himself." She also stated, in response to a question from the court, that "these rights were read to him" and that "he understood these rights and the consequences of his plea." Marcus was present at this hearing but did not speak. Linda Nakamura, Marcus M.'s attorney, concurred in the waivers and the submission of jurisdictional issues on the Department's reports and other documents. The court found the amended petition's allegations true, and it declared James a dependent of the court.

In a report filed on May 5, 2004, the Department informed the court that Marcus M. had been transported to Patton State Hospital on March 23, 2004, after being found incompetent to stand trial on criminal charges. Although the dependency court had ordered reunification services for Marcus, he had not complied with the reunification plan. He had been terminated from the hospital's Alcoholics Anonymous program because of "uncontrollable anxiousness." Marcus was "participating in a behavior modification program to relieve his anxiousness" and upon completion of that program would be transferred back to the Alcoholics Anonymous program. Marcus was not being tested for drug use, nor was he taking any parenting classes, because the hospital did not offer those programs to its patients. The hospital reported that Marcus was extremely anxious and was "exhibiting obsessive/compulsive behavior." He was taking antianxiety medication and his diagnoses were "[s]chizoaffective disorder suspected" and substance abuse. The Department recommended termination of Marcus's reunification services.

At a juvenile court hearing on May 12, 2004, Claudette Boehm, appearing as Marcus M.'s guardian ad litem, informed the court that Marcus was "in anger management, stress management and AA [Alcoholics Anonymous], and he enrolled as soon as he was able to and he's soon to start parenting [classes]." She requested that the matter be set for a contested hearing. Linda Nakamura, Marcus's attorney, said that she would be presenting evidence from the hospital that Marcus was "in those programs." The court directed the Department's social worker to submit a supplemental report about Marcus's participation in programs at Patton State Hospital, and the court set the matter for a contested hearing. Addressing the court directly, Marcus said he wanted his parents "to keep the baby."

In a report filed on July 12, 2004, the Department stated that Marcus M. was enrolled in a "Narcotics and Alcohol Anonymous program through Patton Hospital" and that he "attends the programs 'faithfully.' " Although the hospital did not provide drug testing or parenting programs, the Department

had given Marcus "a folder with parenting literature regarding child development and discipline techniques," and the Department considered Marcus to be "in partial compliance" with the court orders regarding the reunification program. When Department social workers visited Marcus at the hospital on June 28, 2004, he told them he wanted to "complete his rehabilitation at Patton Hospital" before attending any more hearings in the dependency case because attending the hearings distracted him and interfered with his recovery, but he also said he was anxious to see his son, James F. Marcus's mother, as conservator of his person, signed a document waiving Marcus's appearance at the dependency review hearing on July 14, 2004.

At the review hearing on July 14, 2004, which Marcus M. did not attend, his attorney submitted the matter on the Department's reports, conceding that Marcus would "not any time soon be ready to have the child returned to him." The court ordered termination of family reunification services for Marcus and set a hearing to select a permanent plan for James F.

In its permanency planning report filed on November 8, 2004, the Department told the court that James F. had been visiting Marcus M. at Patton State Hospital "approximately every other week." James continued to live with his maternal grandparents, who wanted to adopt him. The Department recommended adoption as the permanent plan for James, with termination of the parental rights of Marcus M. and Cynthia F., and it was in the process of conducting a home study of the maternal grandparents. In a status review report filed on January 12, 2005, the Department stated that Marcus had been released from Patton State Hospital in November 2004, that he was serving a sentence at North Kern State Prison, and that his parents were no longer conservators of his person.

Because the home study of the maternal grandparents had not been completed and filed, the permanency planning hearing (Welf. & Inst. Code, § 366.26) was twice continued. The hearing was then scheduled for August 22, 2005, but Marcus M. did not appear on that date. According to a note in the record, Marcus could not be transported from the prison because he was in "four-point restraints" (meaning, apparently, restraints of both hands and feet). The court again continued the permanency planning hearing. On September 12, 2005, Marcus again did not appear, the court again received information that he was "in four-point restraints," and the court again rescheduled the hearing.

On October 20, 2005, Marcus M. again did not appear for the permanency planning hearing. The juvenile court received information that Marcus had been transferred from North Kern State Prison to the California Medical Facility in Vacaville and that his mental condition was likely the reason for

the transfer and also the reason why he was not transported to court. The court again rescheduled the hearing.

The juvenile court held the permanency planning hearing on December 7, 2005. Marcus M. was not present. Linda Nakamura, Marcus's attorney, explained that Marcus had decided not to attend the hearing because of concerns for his own safety. After hearing testimony from James F.'s mother, Cynthia F., and from his paternal grandfather, the court found by clear and convincing evidence that James was adoptable and that it would be detrimental for him to be returned to his parents' custody. The court selected adoption as the permanent plan for James, and it terminated the parental rights of Marcus and Cynthia.

On Marcus M.'s appeal from the order terminating his parental rights, the Court of Appeal reversed. Because the Department conceded that the juvenile court had erred in appointing a guardian ad litem for Marcus M. without advising him of the purpose or consequences of the appointment, the court focused its analysis on whether the error was structural, requiring automatic reversal, or instead was a trial error subject to harmless error analysis. In a two-to-one decision, the Court of Appeal concluded that automatic reversal was required. We granted the Department's petition for review.

## II

In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. (Code Civ. Proc., § 372; *In re Sara D., supra,* 87 Cal.App.4th at p. 665.) The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. (*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1186 [113 Cal.Rptr.2d 714]; *In re Sara D., supra,* at p. 667.) The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing. (*In re Jessica G., supra,* at pp. 1186–1187; *In re Sara D., supra,* at p. 668.)

Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. (*In re Sara D., supra,* 87 Cal.App.4th at p. 663.) The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. (*Id.* at p. 672.) If the parent consents to the appointment, the parent's due process rights are satisfied. (*Id.* at p. 668.) A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an

inquiry sufficient to satisfy itself that the parent is, or is not, competent. (*Id.* at p. 672.) If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence. (*Id.* at p. 673.)

Here, the Department concedes that the juvenile court did not explain to father Marcus M. what a guardian ad litem is or what powers a guardian ad litem has, nor did the court give Marcus a meaningful opportunity to be heard in opposition to the appointment, and it inaccurately told Marcus that the guardian ad litem was his "second lawyer." Accordingly, there is no dispute that the juvenile court erred in the process by which it appointed Claudette Boehm as guardian ad litem for Marcus. The parties agree, moreover, that the procedures used in this case for appointment of the guardian ad litem did not comport with due process. We accept that concession and do not reach the issue of what due process requires in this context. The issue we address here is whether a juvenile court's error in the procedure used to appoint a guardian ad litem always requires reversal or instead is subject to harmless error analysis.[1]

## III

The Courts of Appeal are divided on the issue before this court, whether a juvenile court's error in the procedure used for appointment of a guardian ad litem for a parent in a dependency proceeding is a form of structural error that requires automatic reversal of an order terminating the parent's parental rights, or whether it is instead subject to harmless error analysis.

The first decision to address the issue was *In re Sara D., supra,* 87 Cal.App.4th 661, in which the Court of Appeal for the Fifth Appellate District in 2001 concluded that a juvenile court's error in the appointment of a guardian ad litem for a parent in a dependency proceeding without holding the required informal hearing does not require reversal of an order terminating parental rights if the violation of the parent's due process rights was harmless beyond a reasonable doubt. (*In re Sara D., supra,* at p. 673.) But the court concluded that the error in that case was not harmless under that standard, and it therefore reversed the juvenile court's order. (*Id.* at pp. 673–674.)

---

[1] The California State Association of Counties, appearing as amicus curiae, has asked us to decide not only that the error is amenable to harmless error analysis, but also that the appropriate harmless error standard is harmless by clear and convincing evidence rather than harmless beyond a reasonable doubt. (See *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1514–1515 [33 Cal.Rptr.3d 89].) Because we did not grant review on the appropriate harmless error standard and the parties have not briefed it, we do not address that issue here.

Several months later, the issue was addressed by Division Four of the Second Appellate District in *In re Jessica G., supra*, 93 Cal.App.4th 1180. In that dependency case, the juvenile court had appointed a guardian ad litem for the mother without explaining to her the purpose or effect of the appointment and without questioning her to determine whether or not she was competent. (*Id.* at p. 1189.) The Court of Appeal concluded that the juvenile court's error was not harmless beyond a reasonable doubt, and on this basis it reversed the orders appointing a guardian ad litem and terminating the mother's parental rights. (*Id.* at pp. 1189–1191.)

Thereafter, in 2004, Division One of the Fourth Appellate District addressed the issue in *In re Daniel S., supra*, 115 Cal.App.4th 903. In that dependency case, the mother, a chronic paranoid schizophrenic, was hospitalized under Welfare and Institutions Code section 5150 because she was considered a danger to herself and others. During her hospitalization, the juvenile court appointed a guardian ad litem for her without giving her notice of the jurisdictional hearing, the dispositional hearing, or the hearing to appoint the guardian ad litem, and without giving her an opportunity to state her views on the appointment of the guardian ad litem. (*In re Daniel S., supra*, at p. 912.) The Court of Appeal concluded that the juvenile court had erred, but that the error was harmless beyond a reasonable doubt and did not require reversal of the jurisdictional or dispositional orders. (*Id.* at pp. 913–916.) At the time of the appointment, the mother was in psychiatric intensive care, she was unable to "process anything," and the hospital authorities would not allow her to attend the dependency hearings in juvenile court. Because of the "strict time lines" that govern dependency proceedings, the Court of Appeal stated, the juvenile court was not required to "wait for an indefinite period of time for [the mother] to sufficiently regain her mental faculties to be able to appreciate notice of the jurisdictional and dispositional hearing or the hearing to appoint a guardian ad litem." (*Id.* at p. 914.)

Then came *In re C. G.* (2005) 129 Cal.App.4th 27 [27 Cal.Rptr.3d 872], another decision from Division Four of the Second Appellate District, and the first to apply an automatic reversal standard. In that dependency case, the Court of Appeal concluded that the juvenile court had erred in appointing a guardian ad litem for the mother without explaining to her the purpose and consequences of the appointment, and without adequate inquiry into her mental competence. (*Id.* at pp. 32–33.) The court concluded that "in the circumstances of this case" the error was structural "as explained in *Arizona v. Fulminante* [(1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246]]," requiring automatic reversal of the order placing the dependent child under legal guardianship, because the erroneous appointment of the guardian ad litem "deprived [the] mother of her status as a party in the case." (*In re C. G., supra*, at p. 34.)

Division One of the Fourth Appellate District addressed the issue a second time in *In re Enrique G.* (2006) 140 Cal.App.4th 676 [44 Cal.Rptr.3d 724]. In that dependency proceeding, the juvenile court appointed a guardian ad litem for the mother without notifying the mother of the proposed appointment or explaining to her its purpose and effects, and without an inquiry into the mental competence of the mother, who was given no opportunity to respond. (*Id.* at p. 684.) The Court of Appeal concluded that the juvenile court violated the mother's due process rights by appointing the guardian ad litem without following the required procedures (*id.* at pp. 683–684), but "that the appointment of a guardian ad litem in violation of a parent's due process rights is a trial error, not a structural one" (*id.* at p. 685). The court reasoned that the error was "not like other errors that have been found to be structural" because it was possible for a reviewing court to "assess the harm resulting from the error." (*Id.* at p. 686.) Because neither the mother's attorney nor the guardian ad litem compromised the mother's fundamental rights, and because the mother failed to participate in any of the reunification services offered to her (*ibid.*), it was "clear that the outcome of the proceedings would have been the same even if the court had not appointed a guardian ad litem" for the mother (*id.* at p. 687). The court affirmed the judgment terminating the mother's parental rights. (*Ibid.*)

In this case, Division Seven of the Second Appellate District stated that if the juvenile court's error in appointing a guardian ad litem for young James's father, Marcus M., were not structural error requiring automatic reversal, it would find the error harmless beyond a reasonable doubt because it could not "conceive of any additional testimony [Marcus] could have presented or evidence he could have submitted which would have altered" the juvenile court's decisions to assume jurisdiction and to terminate Marcus's reunification services and his parental rights, inasmuch as Marcus "was never ready to assume custody of James due to his mental condition and his incarceration" and Marcus's brief and infrequent contacts with James "could not have created the type of bond and parent-child relationship necessary to force this child to forgo adoption." Nevertheless, the Court of Appeal concluded that the error was structural because it "stripped [Marcus] of his right to participate in litigation involving his entitlement to the companionship, care and custody of his son without affording him the process he was due"; because designating the error as structural gives juvenile courts "the enhanced incentive to avoid error of this nature"; and because the error undermined the integrity and fundamental fairness of the dependency proceeding.

Presiding Justice Perluss, in dissent, argued that error in appointing a guardian ad litem for a parent in a dependency proceeding was not structural and did not require automatic reversal, because an appellate court could

accurately determine whether the parent actually suffered prejudice, and also because of the strong public interest in the expeditious resolution of dependency actions.

## IV

In *Arizona v. Fulminante, supra,* 499 U.S. 279, a criminal case in which the erroneous admission into evidence of a defendant's coerced confession was at issue, the United States Supreme Court distinguished constitutional errors called " 'trial errors' " that "occur[] during the presentation of the case to the jury" and the effect of which can "be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt" (*id.* at pp. 307–308), from other, less common constitutional errors that are "structural defect[s] affecting the framework within which the trial proceeds" so that they "defy analysis by 'harmless-error' standards" and can never be harmless (*id.* at pp. 309–310). Structural defects requiring automatic reversal of a criminal conviction typically involve basic protections without which " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " (*Id.* at p. 310; see also *Neder v. United States* (1999) 527 U.S. 1, 9 [144 L.Ed.2d 35, 119 S.Ct. 1827] [stating that a structural error is one that *"necessarily* render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence"].) These include total deprivation of the right to counsel, denial of the right of self-representation, trial before a judge who is not impartial, unlawful exclusion of members of the defendant's race from a grand jury, and denial of the right to a public trial. (*Arizona v. Fulminante, supra,* at p. 310.) Admission of an involuntary confession by the defendant, the high court concluded, was a trial error subject to harmless error analysis. (*Ibid.*)

In *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140 [165 L.Ed.2d 409, 126 S.Ct. 2557], the United States Supreme Court held that erroneous deprivation of a criminal defendant's Sixth Amendment right to counsel of choice was a structural defect requiring reversal of the conviction without inquiry into prejudice. The court explained: "It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." (*Id.* at p. 150 [126 S.Ct. at p. 2565].)

We conclude that error in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice. Determining prejudice in this context does not necessarily require "a speculative inquiry into what might have occurred in an alternate universe." (*United States v. Gonzalez-Lopez, supra*, 548 U.S. at p. 150 [126 S.Ct. at p. 2565].)

Preliminarily, we observe that juvenile dependency proceedings differ from criminal proceedings in ways that affect the determination of whether an error requires automatic reversal of the resulting judgment. The rights and protections afforded parents in a dependency proceeding are not the same as those afforded to the accused in a criminal proceeding. For example, a juvenile court may rely on hearsay contained in a social worker's report to support a jurisdictional finding in a dependency case, although such evidence could not be used to establish guilt in a criminal proceeding. (See *In re Malinda S.* (1990) 51 Cal.3d 368, 373 [272 Cal.Rptr. 787, 795 P.2d 1244].) Also, unlike a defendant in a criminal proceeding, "[a] parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since 'the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence' unlawfully seized." (*In re Mary S.* (1986) 186 Cal.App.3d 414, 418 [230 Cal.Rptr. 726].)

Plea bargaining and other negotiated dispositions play a significant role in criminal proceedings, but not in dependency proceedings. A defendant in a criminal proceeding has a constitutional right to trial by jury (U.S. Const., 6th Amend.), but in a dependency proceeding the juvenile court makes all factual and legal determinations. The prosecution in a criminal proceeding must prove the defendant's guilt beyond a reasonable doubt; in dependency proceedings, the burden of proof is proof by clear and convincing evidence. (*Santosky v. Kramer* (1982) 455 U.S. 745, 769–770 [71 L.Ed.2d 599, 102 S.Ct. 1388].) In a criminal prosecution, the contested issues normally involve *historical* facts (what precisely occurred, and where and when), whereas in a dependency proceeding the issues normally involve evaluations of the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements. Finally, the ultimate consideration in a dependency proceeding is the welfare of the child (see *In re Marilyn H., supra*, 5 Cal.4th at p. 307; *In re Malinda S., supra*, 51 Cal.3d at p. 384), a factor having no clear analogy in a criminal proceeding.

These significant differences between criminal proceedings and dependency proceedings provide reason to question whether the structural error doctrine that has been established for certain errors in criminal proceedings

should be imported wholesale, or unthinkingly, into the quite different context of dependency cases. (See *In re Celine R., supra,* 31 Cal.4th at pp. 58–59 [rejecting analogy to criminal cases and applying harmless error analysis to improper joint representation of children in dependency case]; *In re Sade C.* (1996) 13 Cal.4th 952, 991 [55 Cal.Rptr.2d 771, 920 P.2d 716] [stating that criminal defendants and parents in dependency proceedings "are *not* similarly situated"].)

■ Here, the Court of Appeal concluded that if harmless error analysis were permissible, it would readily conclude that any error in the procedure by which the juvenile court appointed the guardian ad litem for the child's father, Marcus M., did not result in any actual prejudice to him. We agree that Marcus suffered no actual prejudice. The evidence in the record all points to the conclusion that Marcus was incompetent and thus in need of a guardian ad litem. Before the juvenile court appointed the guardian ad litem, Marcus's parents had already been appointed conservators of his person under Probate Code section 1801, which permits a conservator of the person to be appointed "for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter." (Prob. Code, § 1801, subd. (a).) And Marcus was found mentally incompetent to stand trial in criminal proceedings either shortly before or within days after the guardian ad litem appointment; thus, he met the requirements of Penal Code section 1367, which provides that a defendant in a criminal proceeding is mentally incompetent to be tried "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367, subd. (a).) In a dependency proceeding, a juvenile court should appoint a guardian ad litem for a parent if the requirements of *either* Probate Code section 1801 *or* Penal Code section 1367 are satisfied. (*In re Sara D., supra,* 87 Cal.App.4th at p. 667.)

Moreover, the record also strongly indicates that Marcus M. would have consented to the appointment of a guardian ad litem had the purpose and effect of the appointment been correctly explained to him. At the juvenile court hearing where the appointment was made, he was observed to be looking to his relatives for cues on how to answer the court's inquiries, and he declined to attend other hearings on the grounds that it would interfere with his recovery, thus demonstrating his recognition that he needed the sort of assistance that a guardian ad litem could provide. And on those occasions when Marcus did attend hearings in the juvenile dependency matter, there is no indication that he ever disagreed with the decisions of the guardian ad litem regarding management of the case.

■ Although the procedural error in the guardian ad litem appointment caused no actual harm to Marcus M., the Court of Appeal nonetheless

concluded that the error was structural and therefore precluded harmless error analysis. ■ But the United States Supreme Court has explained that most structural defects "defy analysis by 'harmless-error' standards." (*Arizona v. Fulminante, supra,* 499 U.S. at p. 309.) Errors that can "be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt" (*id.* at p. 308) generally are not structural defects. (See *United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 149, fn. 4 [126 S.Ct. at p. 2564] ["here, as we have done in the past, we rest our conclusion of structural error upon the difficulty of assessing the effect of the error . . ."].)

As the Court of Appeal majority noted, there are also a very few constitutional errors that the United States Supreme Court has categorized as structural, not because they defy harmless error analysis, but because prejudice is irrelevant and reversal deemed essential to vindicate the particular constitutional right at issue. (See *United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 149, fn. 4 [126 S.Ct. at p. 2564] ["In addition to . . . difficulty of assessment [of prejudice] . . . , we have also relied on the irrelevance of harmlessness . . . ."].) The United States Supreme Court has not applied this reasoning outside the context of criminal proceedings, however, nor has it ever held that harmlessness is irrelevant when the right of procedural due process—the constitutional right on which Marcus M. here relies—has been violated. We cannot agree with the Court of Appeal majority that prejudice is irrelevant in a dependency proceeding when the welfare of the child is at issue and delay in resolution of the proceeding is inherently prejudicial to the child.

The Court of Appeal majority here decided that the juvenile court's error in appointing a guardian ad litem for Marcus M. was a structural defect because it "stripped [Marcus] of his right to participate in litigation involving his entitlement to the companionship, care and custody of his son without affording him the process he was due"; because designating the error as structural gives juvenile courts "the enhanced incentive to avoid error of this nature"; and because the error undermined the integrity and fundamental fairness of the dependency proceeding. We examine these reasons in turn.

The record does not support the Court of Appeal majority's dramatic assertion that appointment of a guardian ad litem for Marcus M. "stripped [him] of his right to participate" in the action. Nothing suggests that Marcus was unable to express his wishes to the court, either directly or through his appointed guardian, that he lacked actual notice of the proceedings as they unfolded, that the guardian and the attorney appointed for Marcus failed to properly advocate for his parental interests, or that Marcus ever expressed dissatisfaction with the guardian ad litem or asked the juvenile court to vacate her appointment.

The Court of Appeal majority's second reason—that treating the error as structural would give juvenile courts an added incentive to avoid the error in the future—is similarly unpersuasive. We assume that juvenile courts make every effort to follow required procedures, and we question whether treating a procedural error as a structural defect requiring automatic reversal would significantly decrease the frequency of such errors. Moreover, the price that would be paid for this added incentive, in the form of needless reversals of dependency judgments, is unacceptably high in light of the strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible. (See *In re Josiah Z.* (2005) 36 Cal.4th 664, 674 [31 Cal.Rptr.3d 472, 115 P.3d 1133] ["the priority in dependency proceedings is to identify and carry out the services and placement that best serve the child's interests as swiftly as possible . . ."]; *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 [10 Cal.Rptr.3d 205, 85 P.3d 2] [the strong interest in resolving dependency proceedings expeditiously "would be thwarted if the proceeding had to be redone without any showing the new proceeding would have a different outcome"].)

The Court of Appeal majority's third reason was that the juvenile court's error undermined the integrity of the dependency proceeding. But in judicial proceedings the essence of integrity is the use of fair procedures to achieve a just result. The purpose of appointing a guardian ad litem in a dependency case is to protect the parent's rights (*In re Christina B.* (1993) 19 Cal.App.4th 1441, 1453 [23 Cal.Rptr.2d 918]), and it is reasonable to infer, in the absence of evidence to the contrary, that a guardian ad litem has acted zealously to preserve the parent's interest in the companionship, care, and custody of the child, and thus that the parent benefited from the guardian ad litem's appointment. For this reason, the use of flawed procedures in the appointment of a guardian ad litem for a parent does not inevitably and necessarily render dependency proceedings unfair in any fundamental sense. As noted above, the evidence in the record establishes that Marcus M. was incompetent and in need of the guardian ad item when the juvenile court made the appointment. Moreover, as the Court of Appeal reasonably concluded, the result achieved here was certainly correct, and therefore just. Due to his mental condition and incarceration, Marcus was never ready to assume custody of his young son, James F. His contacts with James during the first two months of James's life and their biweekly visits between July and November of 2004 during Marcus's confinement at Patton State Hospital, when James was only one year old, "could not have created the type of bond and parent-child relationship necessary to force this child to forgo adoption."

If the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required. (See *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1123–1124 [278 Cal.Rptr. 346, 805 P.2d 300].) We conclude that a

juvenile court's error in the process used for appointment of a guardian ad litem for a parent in a dependency proceeding is a form of trial error that is amenable to harmless error analysis.[2]

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[2] To the extent it is inconsistent with this conclusion, we disapprove *In re C. G., supra*, 129 Cal.App.4th 27.