Filed 9/23/16  In re Nolan P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Nolan P., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.T.,<br><br>        Defendant and Appellant. | A147578<br><br>(Sonoma County<br>Super. Ct. No. 3542DEP) |

In this Welfare and Institutions Code section 300[1] proceeding, mother D.T. appeals from jurisdiction and disposition orders finding that her son came within the jurisdiction of the juvenile court and ordering reunification services.  D.T. contends that at the combined jurisdiction/disposition hearing, the juvenile court failed to abide by the requirements of California Rules of Court, rule 5.682, to insure that she knowingly and intelligently waived her due process rights when she submitted on jurisdiction.  We agree that the court erred in accepting her submission without first complying with rule 5.682, but we conclude this error was harmless.  We thus affirm.

---

[1] All statutory references are to the Welfare and Institutions Code, except where otherwise noted.

1

## BACKGROUND

D.T. and Richard P.[2] are the parents of Nolan P., who was 14 years old when this dependency proceeding was filed in 2015. The family's history with child protective services dates back to 2005, when there was a referral concerning emotional abuse of Nolan by Richard. Since that time, there have been 12 more referrals, three of which were substantiated.

The first substantiated referral was in 2011 and led to a section 300 petition. The court sustained an allegation that D.T. physically assaulted Nolan in public while verbally berating him, and he was declared a dependent of the juvenile court. Nolan was released to Richard's custody, and the court terminated jurisdiction with a family court order granting Richard full physical and legal custody.

The second substantiated referral—this one alleging physical abuse of Nolan by Richard—was in 2013. As a result, D.T. regained custody of Nolan in November of that year.

The third was on August 6, 2015 and alleged emotional abuse of Nolan by both of his parents.

The section 300 juvenile dependency petition that is the subject of this proceeding was filed by respondent Sonoma County Human Services Department (Department) on October 9, 2015, and alleged that Nolan came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (c) (serious emotional damage). Specifically:

(a)(1): On or about August 6, 2015, Richard physically assaulted Nolan and pinned him down with a knee to his chest until he experienced pain and difficulty breathing;

(a)(2): On or about August 18, 2015, Richard, while under the influence of alcohol, pushed and hit Nolan;

---

[2] As this appeal was brought only by D.T., we omit facts regarding Richard except where relevant to the issues before us.

(b)(1):  Richard had a substance abuse problem that rendered him unable to safely care for Nolan and led to physical altercations between the two;

(b)(2):  D.T. knew about Richard's alcohol problem and propensity for violence but she failed to protect Nolan and placed him at substantial risk by allowing Richard to come to their house with alcohol;

(b)(3):  D.T. had a substance abuse problem that rendered her unable to safely care for Nolan, who reported that she drank malt liquor every day;

(b)(4):  In July 2015, Nolan took medications prescribed to D.T., but she failed to seek medical treatment for him despite that he became ill, and she failed to keep her medications out of his reach;

(c)(1):  Nolan had serious emotional and behavioral problems (including cutting himself, taking D.T.'s medications, using illegal drugs and alcohol, and refusing to go to school) that were exacerbated by his parents' drinking and arguing.

Nolan was taken into protective custody, placed at Valley of the Moon Children's Home (Valley of the Moon), and ordered detained on October 13.

A jurisdiction hearing was scheduled for October 28, 2105, in advance of which the Department prepared a report detailing, among other things, D.T.'s response to the allegations in the petition.  She denied them all, providing the following explanations to the social worker:

D.T. said allegation (a)(1) was " 'completely false,' " claiming Richard was only trying to restrain Nolan, who was " 'wild' " because of a dispute over a video game.  She said that Nolan "worked himself into a frenzy" and was swinging at Richard, who then embraced him in a bear hug, and they both fell to the floor.  According to D.T., she and Richard were not a couple, explaining that he had been staying at her house for a week or two to give her rides because her car had broken down.

As to the (a)(2) allegation, D.T. said on August 18, Richard and Nolan got into a food fight over a slice over pizza.  She denied that Richard hit Nolan or that Nolan was injured, and while there was a police report on the incident, the police officer did not take

3

Nolan seriously.  Richard was no longer around because her car was working so she did not need rides from him.

Disputing the (b)(1) allegation, D.T. stated she had never seen a physical altercation between Richard and Nolan other than those two described above.  She said Richard drank " 'a couple of beers after work and doesn't get drunk.' "  She acknowledged he verbally abused Nolan when they lived together, but she told him not to call him names and did not allow it in her house.

As to the (b)(2) allegation, D.T. claimed Richard would " 'drink a beer outside or at the liquor store.  Not in the house.  He was not drunk in the house.' "  She acknowledged " 'one drunkenness with the food fight,' " but said there were " 'never any marks or bruises.' "  D.T. also acknowledged that Nolan drank a can of beer on his fourteenth birthday.

D.T. had " 'a lot to say' " about allegation (b)(3), stating, " 'I don't drink malt liquor every day.  I don't drink beer every day.  Here at work we go out for pizza and beer.  Social worker Bill Harville came over that night and smelled beer on me.  Nolan was abused by his dad when he was drunk so he associates beer with abuse.'  She stated that anytime she goes to the neighbor's, Nolan thinks she's having beer.  'Nolan accuses of me of drinking.  I don't drink.  He knows I'm not a drinker.  The only thing I need is the Ultram,' " which she takes for pain management.  D.T. claimed that Nolan "says things like that" because he is mad about dinner, explaining that she used to get home late, so he was responsible for making his dinner from food in the freezer.  And she added, " 'There's no substance abuse.  It's so untrue.  I can't believe it would be exaggerated that huge.  It happened in the last report.  Everyone lied.' "

As to allegation (b)(4), D.T. denied that Nolan had access to her medications.  She claimed he took an aspirin he found on the floor and then got nervous about it, but he was fine at the hospital.  She acknowledged he twice took her Ultram because he thought pain pills would help his back, but he threw it up so she got him some food and a soda and he was fine.  Since then, she has locked her medication in the car.

4

Lastly, as to the (c)(1) allegation, D.T. said, " 'None of that is true.  Not one sentence of that is true.  That is so blown out.  I don't fight with the dad at all.  None of that is true.' "  D.T. claimed Nolan's " 'emotional damage' " happened when he was placed with Richard, which was when he started cutting himself.  She blamed his truancy on his " 'emotional damage from the past,' " while also blaming it on transportation problems because the bus would not come into the canyon where they lived.  She denied Nolan was violent towards her.

The social worker spoke with Zelda Bettman from Sonoma County Behavioral Health (SCBH), who had offered the family therapeutic behavioral services but D.T. did not engage in the services.  Ms. Bettman believed D.T. took no responsibility for the family's situation and did not seem to understand that she is responsible for Nolan.  According to Ms. Bettman, D.T. does not want to medicate Nolan but continues to make his behavior the focus of their problems.  She believed Nolan had some attention issues, but said he does "very well, considering what he has been through."  D.T. also maintains contact with Richard, despite the danger he presents, which D.T. does not seem to "grasp."  D.T. continues to blame Nolan's truancy on the school district's failure to provide a bus, but Ms. Bettman noted that arrangements were made to get Nolan to school but he was not ready on time and would miss his ride.  She did not believe Nolan had ever been taught to get up and out the door on his own.  Ms. Bettman also expressed concern about Nolan having food available, but D.T. claimed there was always food in the freezer that he should be capable of preparing for himself.  Nolan told Ms. Bettman he liked it at Valley of the Moon because he liked having three meals a day.

The social worker also interviewed D.T.'s two sisters, Shari D. and Vicki T.  Shari expressed concern for Nolan's physical and emotional well-being.  She reported that D.T. and Richard both had substance abuse problems and always had a "very rocky relationship . . . ."  D.T. started drinking when she was a teenager, and she drank early on in her pregnancy, quitting when she found out she was pregnant.  Richard used to drink a lot but then " 'simmered down' " when he got custody of Nolan.  D.T. regained custody of their son "by default" when Richard did not appear in court because he did not receive

5

some paperwork. D.T. had been taking Ultram for pain for 15 years, and Shari believed she was addicted to the medication.

Shari described Nolan as " 'the sweetest boy in the world,' " although he is "quite defiant," and has " 'ADHD, or OCD, or something.' " She said he is "manipulative" and "smarter than his parents," and she did not think D.T. and Richard could handle him.

Shari had never seen any evidence that Richard physically abused Nolan. D.T. told her, however, that she had to " 'save Nolan' " because Richard was hitting him. According to Shari, both parents had been jailed due to domestic violence, and Nolan had witnessed a lot of violence between the two of them.

Vicki reported that D.T. did not discipline Nolan or set boundaries for him when he was younger, and he developed behavioral problems at a young age. Vicki overheard D.T. telling Nolan, " 'Do not tell the judge I hit you, if you tell the judge I hit you, you'll never see me again and you will never see your father again.' "

Vicki knew Richard drank a lot of beer and could get mean, and she did not believe he knew how to handle " 'a kid like Nolan.' " Vicki noted that D.T. was able to regain custody of Nolan, and everyone believed she did so for the benefits and housing. According to Vicki, the parents do not medicate Nolan for his attention deficit hyperactivity disorder because they think it is bad for him and causes suicide.

The Department's jurisdiction report concluded with the following assessment/ evaluation:

"Before the Court is the matter of Nolan P[.], a sweet, yet troubled young teenager. Nolan has witnessed years of domestic violence between his parents and has watched as their substance abuse has led them to make choices putting his safety at risk repeatedly. Nolan's mother, [D.T.], is in complete denial of any substance abuse, and refuses to take any accountability for her actions or her role in Nolan's care, or lack thereof. She repeatedly stated that Nolan 'works himself into a frenzy' and blamed him for many of the incidents listed within the allegations. [D.T.] contradicted her own statements by saying that Nolan never punched or hit her, yet reported to police that he did so repeatedly, seriously calling her credibility into question. Throughout the course

6

of this investigation, [D.T.] found a way to place blame on the Department, other social workers, Nolan, her family, Nolan's school, SCBH, and [Richard], taking absolutely no responsibility for the current situation. It is agreed that Nolan does have some behavior issues and concerns, but this investigator finds that to be of little surprise given the lack of parenting he has grown up with. By [D.T.]'s own account, she leaves the house before Nolan wakes up, offering him no guidance in getting ready for school, blaming the school and saying she wants to appeal the [school attendance review board] because it is not her fault. [D.T.] sees nothing amiss in her situation with Nolan, other than the several outside forces that have repeatedly tried to help her and Nolan. Ms. Bettman feels that [D.T.]'s thinking is wrong, possibly due to head trauma or extensive substance abuse. It is this investigator's opinion that [D.T.] is unable to accept responsibility for her role in Nolan's life and the current situation. Nolan is a sweet boy who is very protective of his parents, yet is asking for help. He reports liking living at Valley of the Moon because he enjoys eating three meals a day. While he has shown some behavioral concerns with AWOL behaviors, he has, to date, returned to the home and stated that he needs some time to himself sometimes. It is clear that Nolan's issues will not be addressed in his mother's care and he will likely experience more neglect and abuse as her pattern of allowing [Richard] into their lives continues, and her minimization of the abuse and neglect already experienced by Nolan shows no sign of abating. It is for these reasons that the Department respectfully recommends that the Court sustain the allegations of the Petition, establish Jurisdiction and that the child, Nolan D[.] P[.], remain detained."

The Department attached a number of documents to the jurisdiction report, including Sonoma County Sheriff's Department call reports documenting the following six recent incidents involving the family:

On August 18, 2015, sheriff's deputies responded to D.T.'s house after she called 911 because Richard would not leave her house. He had been drinking heavily and pushed Nolan after a piece of pizza fell on the floor. The house was ransacked, and Nolan reported being hit by his father. The responding officer noted that Richard was homeless and had been staying at the house to watch Nolan while D.T. was out of town.

7

On August 31, 2015, D.T. called 911 because Nolan was "driving her crazy," opening her door and turning on her light. He had punched her in the arm, and was spitting on and laughing at her. The responding officer reported that Nolan was complaining D.T. would not make him dinner, and she was upset because he hit her in the head with a pillow and "caused her brain to hurt." Nolan said he drinks two beers with a friend every day. D.T. declined to press charges.

On September 1, 2015, the Sheriff's Department received a request from school superintendent Phyllis Parisi for a welfare check because Nolan had attended only one day of school that year. Ms. Parisi was concerned because D.T. had confided that she was losing control over Nolan, who was becoming violent with her. D.T. had called the school early that morning to report that Nolan was refusing to go to school. D.T. was also concerned because Nolan was "helping [him]self to [her] anti-depressants and various other prescribed drugs."

On September 7, 2015, sheriff's deputies responded to a call from D.T. who said that Nolan was destroying things. She subsequently canceled the call, reporting that he was leaving with Richard.

On September 11, 2015, the Sheriff's Department received a call for a welfare check because Nolan was home alone, and the reporting party was concerned he would be walking along a dangerous road to get to school. Nolan received a ride to school from a neighbor.

On October 6, 2015, D.T. called to request a welfare check because Nolan told her he got a ride to school but he never arrived and she was afraid he was skipping school to do drugs with a neighbor. The responding officer determined that Nolan had overslept.

In light of the foregoing, the Department recommended that the court sustain the allegations in the petition and take jurisdiction over Nolan.

The matter was subsequently continued for a combined jurisdiction/disposition hearing, prior to which the Department submitted a disposition report. The report detailed D.T.'s history, describing her relationship with Richard, her years of transience and unstable housing (both with and without Nolan), and the changes in custody of Nolan

8

over the years. It also summarized the following conversations that social worker had with two service providers.

Brandon Allen, a case manager at the Keeping Kids in School program who had been working with the family since August 2015, reported that it was difficult to get D.T. to attend meetings and participate in services. He was going to offer therapeutic behavioral services through SCBH, but D.T. did not seem to understand that she needed to participate as well. According to Mr. Allen, even after he became involved with the family, Nolan was not going to school. One of his major concerns was that Richard, who was abusive towards Nolan, was still around. Nolan was able to recognize that D.T. was not capable of being a good parent when she drank, and he would become verbally aggressive and would cut himself to get her attention. Mr. Allen believed that Nolan was having difficulties at Valley of the Moon because he went from no supervision while in D.T.'s care to constant supervision.

Relyn Carrera, a therapist at SCBH, met with Nolan weekly and reported that he seemed to be opening up to her and was "pretty talkative" about the things that were going on with him. He asked about seeing a psychiatrist and expressed an interest in medication to treat his attention deficit hyperactivity disorder, which D.T. had always resisted. He was beginning to work through some anger issues towards his mother, and while he wanted to live with her, he recognized that was not a good option at that time.

Finally, the Department's "assessment/evaluation" provided the following summary: "Before the Court is the matter of Nolan P[.], a very quiet, yet very kind and intelligent young teenager. Nolan has experienced much trauma in his young life, being transient and homeless for most of his life. His parents have a history of domestic violence and alcohol abuse. He has been physically abused by his father on more than one occasion and has had a complete lack of supervision by his mother. Nolan is currently failing every subject in school as he has not regularly attended school for over a year, and until coming to [Valley of the Moon]. [D.T.] has still not been able to take any accountability or admit any wrongdoing in her care for Nolan, blaming everyone else involved, including SCBH, the father, her sisters, Nolan, the Department and several

9

others. She has often minimized the physical abuse Nolan suffered as well as the domestic violence between herself and [Richard]. Throughout the course of the current investigation, [D.T.] has stated that Nolan is safe with her and he should be home with her. When asked if she were in contact with [Richard], she stated that he often comes to sleep in his truck outside her home. She stated that she may not [be] able to keep the cabin since she will no longer receive Nolan's SSI checks, so she has asked [Richard] to live in the trailer so that she can keep it until Nolan comes home. [D.T.'s] continued contact with [Richard], and her request of him to live in her home until Nolan is returned to her custody, indicates that [D.T.] still does not have a clear understanding of the danger [Richard] poses to Nolan. She continues to downplay the incident and physical abuse that occurred and has still not taken any accountability for the neglect and emotional abuse Nolan has experienced in her care, particularly when his father is also in the picture. While Nolan sometimes states that he wants to come home, he has stated, including in Court during the Jurisdiction Hearing on October 28, 2015, that he does not want to return to his mother's care until she completes a substance abuse program to address her alcohol abuse."

Based on the foregoing, the Department recommended that the court sustain the allegations in the petition, declare Nolan a dependent, and order reunification services for D.T.

On the afternoon of December 16, the matter came on for a contested jurisdiction/disposition hearing as scheduled. D.T. was not present at the outset of the hearing, which commenced with counsel for Richard informing the court that the parties had participated in a settlement conference that morning and that they were "fairly close to having Nolan back with mom hopefully fairly soon." Counsel represented that under the agreement reached by the parties, the petition would be amended to strike the (a) allegations, and the court would sustain the (b) and (c) allegations, order reunification services for the parents, and authorize a trial home visit.

10

D.T.'s counsel concurred, noting that she had hoped D.T. would be at the hearing, agreeing that the petition would be amended, and advising "we are withdrawing our contest and submitting."

Nolan's counsel added that D.T. was not there because she was attempting to get Nolan to school. He complimented both parents on being cooperative and was hopeful Nolan would return to Valley of the Moon so he could then be returned to D.T. through proper channels.

County counsel then requested that, consistent with the parties' agreement, the court sustain the section 300 (b) and (c) allegations,[3] order reunification services for both parents, and authorize a trial home visit.

A discussion concerning the Indian Child Welfare Act (ICWA) ensued, during which time D.T. apparently arrived at the hearing, evidenced by the court's statement that D.T. "was able to join us for the hearing" so it would give D.T. and her counsel an opportunity to speak. The court then stated, "[a]ll right. With that, what I'm going to do is I'm going to adopt the proposed findings and orders except for the provision about ICWA not applying because we need to check into that. So, waive reading?" Counsel for D.T. and Nolan responded affirmatively, and the court gave notice of appeal rights and continued the matter for an ICWA compliance hearing and six month review.

The court's written findings and orders found true the allegations as amended, declared Nolan a dependent of the juvenile court, and ordered reunification services for both parents.

D.T. filed a timely notice of appeal.

---

[3] According to the reporter's transcript, county counsel asked the court to sustain the (b) and (g) allegations. The findings and order signed by the court struck allegation (a) and found that Nolan came within section 300, subdivisions (b) and (g). The reference to subdivision (g) was apparently an error, as it appears the parties and the court intended that the court sustain the subdivision (b) and (c) allegations. The petition did not contain any subdivision (g) allegations, and all other references to the allegations were to subdivisions (b) and (c).

11

## DISCUSSION

California Rules of Court, rule 5.682[4] sets forth a series of advisements the juvenile court must provide and findings it must make when a parent waives the right to a contested jurisdiction hearing in a dependency proceeding. D.T. contends that the court deprived her of due process when it accepted her submission on jurisdiction without following the mandates of rule 5.682, and thus without confirming she was making a knowing and intelligent waiver of her trial rights. She further contends that she was prejudiced by the court's error and the jurisdiction and disposition findings and orders must be reversed. The Department does not dispute that the court erred in failing to comply with rule 5.682, completely omitting any discussion of this issue. Instead, they argue that D.T. forfeited her right to raise this argument on appeal and, alternatively, that the error was harmless. We conclude there was no forfeiture and the juvenile court erred as D.T. claims it did, but the error was harmless.

Turning first to the forfeiture issue, the Department argues D.T. forfeited her right to challenge the jurisdiction and disposition findings and orders because she "participated in extensive settlement negotiations and failed to object to the manner in which the juvenile court conducted the proceedings." The rule of forfeiture does indeed apply in juvenile dependency litigation—under the proper circumstances. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) These are not such circumstances.

*In re Rashad B.* (1999) 76 Cal.App.4th 442 is instructive. There, the mother appealed the order terminating her parental rights and freeing her two children for adoption pursuant to section 366.26, asserting errors that occurred prior to the section 366.26 hearing (e.g., alleged errors with the jurisdiction and disposition orders). She implicitly conceded that her failure to seek writ review would ordinarily bar her from raising those issues, but she argued that her lack of notice of her right to file a writ petition excused her failure and rendered her claims cognizable on appeal. (*Id.* at pp. 446–447.) The Court of Appeal agreed, noting that the failure to have a valid address

---

[4] All rule references are to the California Rules of Court.

for the mother was attributable to an error by the court, and there was thus no forfeiture. (*Id.* at pp. 449–450.)

Here, the juvenile court failed to inform D.T. of her due process rights with respect to the jurisdiction hearing. As such, and as recognized in *In re Rashad B., supra,* 76 Cal.App.4th 442, where the court failed to discharge its duty to advise the parent of his or her rights, the parent is not barred from challenging the ensuing order on appeal. (See also *In re Jessica G.* (2001) 93 Cal.App.4th 1180 [no forfeiture of right to appeal where court violated mother's due process right in appointing a guardian ad litem].)

The authorities on which the Department relies do not persuade us otherwise. It cites *In re N.M.* (2011) 197 Cal.App.4th 159, 161–168, quoting the following passage: "[A]greement to the negotiated settlement constitutes an implied waiver of [the] right to appeal the sufficiency of the evidence to support the jurisdictional finding." And they quote Civil Code section 3515—"[She] who consents to an act is not wronged by it."—and section 3516—"Acquiescence in error takes away the right of objecting to it." As we understand the purported significance of these authorities, the Department essentially argues that D.T. is barred from claiming she did not make an informed decision to submit on jurisdiction because she agreed to submit on jurisdiction. This most certainly cannot be the law, as it would defeat the very purpose of the rule 5.682 advisements and findings. We thus conclude that under these circumstances there was no forfeiture, and we turn to the merits of D.T.'s claim.

Subdivision (b) of rule 5.682 requires the court, at the commencement of a jurisdiction hearing, to advise the parent of the following rights: "(1) The right to a hearing by the court on the issues raised by the petition; [¶] (2) The right to assert any privilege against self-incrimination; [¶] (3) The right to confront and to cross-examine all witnesses called to testify; [¶] (4) The right to use the process of the court to compel attendance of witnesses on behalf of the parent or guardian; and [¶] (5) The right, if the child has been removed, to have the child returned to the parent or guardian within two working days after a finding by the court that the child does not come within the jurisdiction of the juvenile court under section 300 . . . ." The parent has the option of

waiving these rights by foregoing a trial on the jurisdictional allegations and instead: (1) admitting the allegations of the petition; (2) pleading no contest; or (3) submitting the matter to the court without further hearing and based on the information already before the court. (Rule 5.682(e).)

Subdivision (f) of rule 5.682 provides that if the parent elects to admit the allegations, plead no contest, or submit the matter, as set forth in subdivision (e), the court "must" make findings that include the following: the parent "knowingly and intelligently waived the right to trial on the issues by the court, the right to assert the privilege against self-incrimination, and the right to confront and to cross-examine adverse witnesses and to use the process of the court to compel the attendance of witnesses" on the parent's behalf (rule 5.682(f)(3)); the parent "understands the nature of the conduct alleged in the petition and the possible consequences of an admission, plea of no contest, or submission" (rule 5.682(f)(4)); and the "admission, plea of no contest, or submission by the parent or guardian is freely and voluntarily made" (rule 5.682(f)(5)).

As recently summarized in *In re S.N.* (2016) 2 Cal.App.5th 665, 671, fn. and italics omitted], the procedures dictated by rule 5.682 operate as follows: "If a parent denies the allegations in a section 300 petition, the juvenile court must hold a contested hearing on them. (California Rules of Court, rule 5.684(a).) But even if the parent does not contest the allegations, the court must advise the parent of the parent's rights to receive a hearing on the issues raised by the petition, to assert any privilege against self-incrimination, to confront and cross-examine witnesses, to compel witnesses' attendance, and to have the child returned if the court finds that the child does not come within the jurisdiction of the juvenile court under section 300. (Rule 5.682(b).) If, after being so advised, the parent wishes to admit the allegations or enter a plea of no contest (see rule 5.682(e)), the court must find and state on the record that it is satisfied that the parent understands the nature of the allegations and the direct consequences of the admission, and understands and knowingly and intelligently waives the rights in rule 5.682(b). (Rule 5.682(c), (f).)"

14

*In re Monique T.* (1992) 2 Cal.App.4th 1372 (*Monique T.*) illustrates the mandatory nature of the rule 5.682 advisements and findings. At a detention hearing, the mother, through her counsel, waived reading of the petition, advice of rights, and explanation of proceedings, and the court ordered the child detained. The mother, again through counsel, then submitted the matter on jurisdiction. (*Monique T., supra,* at p. 1375.) The court did not advise the mother of the rights she would be waiving by her submission. Instead, it engaged in a colloquy with her counsel in which the court asked counsel if the mother waived reading of the petition and advice of rights; counsel responded affirmatively, and represented that the mother was prepared to submit on the petition with the knowledge that the court would "almost undoubtedly find jurisdiction"; the court inquired if counsel was satisfied that the mother understood the rights she was giving up, counsel again responded affirmatively, and the court found that the mother understood her rights and was voluntarily waiving them. (*Id.* at p. 1376.)

On appeal, the mother contended that the court committed reversible error by failing to advise her of her due process rights at the jurisdictional hearing, as mandated by rule 5.682's predecessor (former rule 1449(b)). (*Monique T., supra,* 2 Cal.App.4th at p. 1375.) The Court of Appeal agreed. It noted that the rights to trial on the issues raised by the petition, to confront and cross-examine witnesses, and to compel the attendance of witnesses, were "essential ingredients of due process," and "[b]y adopting [former] *rule 1449*, the Judicial Counsel recognized these rights are essential to a fair jurisdictional proceeding." Further, the court observed, the rule provided that the court " 'shall' advise the parent of these rights and make a finding that she knowingly and intelligently waived them." (*Id.* at p. 1377, italics omitted.) In light of the mandatory nature of these requirements and because the court neither explained the due process rights to the mother nor obtained her personal waiver of these rights, the court concluded "it was error to accept a waiver of these rights based only on counsel's representations." (*Ibid*; see also *In re Patricia T.* (2001) 91 Cal.App.4th 400, 404.)

*Monique T.* makes clear that the court must advise the parent—not counsel—of his or her due process rights, and the parent must personally make a knowing and intelligent

waiver of these rights. Here, D.T. was not even at the hearing at the time her counsel withdrew her contest and submitted on jurisdiction. And when D.T. did appear at the hearing, the court did not advise her of her due process rights, obtain her personal waiver of those rights, or find that she made a knowing and intelligent waiver of these rights. We thus conclude that the juvenile court erred when it accepted D.T.'s counsel's submission without complying with rule 5.682. This error, however, does not necessitate reversal.

The court in *Monique T., supra,* 2 Cal.App.4th at pp. 1377–1378, held that a violation of rule 5.682 required reversal only if the parent demonstrates prejudice. It declined to decide, however, whether the correct standard of review was the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 or the reasonable probability test under *People v. Watson* (1956) 46 Cal.2d 818, 836. This was so because under the facts of that case, the error was harmless under either standard. (*Monique T., supra,* at p. 1378.) We need not decide the standard of review for the same reason, as the evidence in the record overwhelmingly supports juvenile court jurisdiction over Nolan.

The two (a) allegations pertained to two separate incidents in which Richard physically abused Nolan. While D.T. denied to the social worker that the two incidents occurred as alleged in the petition, she admitted that the altercations happened. And despite D.T.'s denial that Richard assaulted Nolan during the altercations, there was evidence that he did. As to the first incident, Nolan told a social worker that Richard pinned him down with a knee to the chest until he could not breathe and that it hurt at the time. And as to the second incident, D.T. reported to 911 dispatch that Richard had been drinking heavily and pushed Nolan and she was trying to get him to leave the house. Nolan confirmed to the responding officer that Richard had hit him. Despite this evidence that Richard continued to be physically abusive towards Nolan, D.T. continued to allow Richard into their house, placing Nolan at risk of harm.

There was also abundant evidence supporting the (b) allegations, that Nolan had suffered, or there was a substantial risk that he would suffer, serious physical harm or

16

illness due to his parents' failure to protect him and provide for his regular care due to their substance abuse issues. Nolan reported to the social worker that both of his parents drank daily to the point where their behavior was affected, which caused him distress, and that Richard got "really mean" when he drank. He confirmed that there were verbal and physical conflicts between him and his parents and that his parents engaged in domestic violence in his presence.

D.T.'s sister Shari told the social worker that both D.T. and Richard had long suffered from substance abuse problems, D.T. having been drinking since she was a teenager. Shari also believed D.T. was addicted to Ultram, which she had been taking for 15 years. Vicki confirmed that Richard drank a lot and would get mean when he was drunk.

D.T. acknowledged that Nolan twice took her Ultram pills and that she did not seek medical treatment for him because he threw up the pill and was fine after she got him food and a soda. On another occasion, school superintendent Parisi observed Nolan in her office exhibiting symptoms of a drug overdose. Nolan confirmed that he had taken multiple medications he had stolen from D.T. and he was taken to the hospital by ambulance.

Lastly, there was overwhelming evidence supporting the (c)(1) allegation, that Nolan had serious emotional and behavioral problems, including cutting himself, taking D.T.'s medications, using illegal drugs and alcohol, and refusing to go to school, that were exacerbated by his parents drinking and arguing.

D.T. herself admitted that Nolan was becoming violent. For example, she called the Department, seeking help because Nolan was " 'very abusive' " to her physically and emotionally. She also called the police because Nolan was keeping her up all night and refused to leave her alone, spitting at her, pushing her, and even punching her. She also reported to the Department on another occasion that Nolan had "become very abusive like his father." D.T. also acknowledged Nolan's self-harming behaviors, admitting that he was cutting himself.

17

There was evidence that Nolan was using drugs and drinking. Nolan himself reported to a social worker that he had taken his parents' medications and that he sometimes drank beer because it helped him sleep. D.T. acknowledged that he had taken her Ultram on more than one occasion. And superintendent Parisi had observed Nolan experiencing symptoms of drug overdose and sought emergency medical treatment for him.

Lastly, the evidence of Nolan's truancy was extensive and undeniable.

D.T. has identified no evidence suggesting she could have successfully contested jurisdiction. (See *Monique T., supra,* 2 Cal.App.4th at p. 1378.) In light of this, we conclude that the outcome of the jurisdiction hearing—that is, the court taking jurisdiction over Nolan—would have been the same even in the absence of the juvenile court's error. The error was thus harmless.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

18