Filed 4/27/22; Modified and certified for partial publication 5/24/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.O., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>C.O.,<br><br>    Defendant and Appellant. | G060663<br><br>(Super. Ct. No. 20DP1345)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Reversed and remanded with instructions.

        Linda B. Puertas, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

## INTRODUCTION

Juvenile dependency courts shoulder a sacred burden in our system of justice. Facing heavy workloads with correspondingly heavy factual records, they stand as stewards of the welfare of each child brought before them. This burden is not an easy one, yet our experience is that our dependency courts carry it with remarkable efficiency and diligence. Rarely do we feel the need to second-guess their decisions.

But we must always bear in mind one of the ultimate consequences of dependency proceedings: the termination of parental rights. There are few consequences as weighty. It is therefore incumbent upon us as a reviewing court to ensure that the procedures employed are commensurate with the outcome. As the United States Supreme Court has stated, "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." (*Santosky v. Kramer* (1982) 455 U.S. 745, 753-754.)

In those rare instances where the state does not provide such procedures, the record must demonstrate that the lack of observance of proper procedures was harmless beyond a reasonable doubt. Here, C.O. (mother) appeals from an order terminating her parental rights to her daughter Z.O. The juvenile court appointed a

2

guardian ad litem (GAL) for mother without providing grounds or explanation in the record, as it was required to do. We agree with mother that this error deprived her not only of the ability to participate at critical stages in the proceedings, but also the ability to effectively appeal and challenge the juvenile court's reasoning for the appointment of the GAL, i.e., that mother lacked competence to understand the nature or consequences of the proceedings and to assist counsel regarding the underlying litigation. Unfortunately, the record before us in the present matter does not give us sufficient confidence that the error was harmless beyond a reasonable doubt. And as a result, we must reverse the judgment and remand for further proceedings.

FACTS

On October 6, 2020, the Anaheim Police Department received a report of flooding inside a hotel room occupied by mother, who at the time appeared to be under the influence. Upon responding to the call, they found no one in the room. The walls and electrical outlets were burned, and the sprinkler system had been triggered. Police were able to locate mother nearby and questioned her. She stated she had been trying to destroy cameras and other surveillance equipment over the previous week, because she believed the management of the hotel had placed them around her room.

Mother had been living in the hotel with four-year-old Z.O. since May of 2020, with Z.O.'s father, J.O. (father) periodically visiting.[1] Father and Z.O. were present as mother was destroying the room, but father had left with the child before authorities arrived. Mother was arrested and taken into custody. The matter was referred to the Orange County Social Services Agency (SSA) the same day.

Mother had an SSA referral history going back to 2006 with her previous partner and children, and to November 2012 with father. There were allegations of

---

[1]Mother and father were married but separated. They were sharing custody of Z.O. by informal agreement.

neglect and domestic violence occurring in front of the children. Mother had failed voluntary family services in 2007 and her parental rights were terminated as to the three children she had with her previous partner. Additionally, she and father had failed reunification services and had their parental rights terminated as to Z.O.'s older sibling in 2015. Mother and father relied on public assistance, and father admitted there had been domestic violence between he and mother. However, he denied using physical discipline with Z.O.

At the time of her 2020 arrest, mother was found to have a methamphetamine pipe in her possession and admitted to firefighters she had smoked methamphetamine that morning. But at the time of her interview with SSA on October 16, 2020, she denied using the drug. She also denied having any mental health issues, even though she insisted there were cameras in her hotel room. When father was asked about mother's conduct the day of the incident, he expressed no concerns and said she was "fine." SSA felt the couple was minimizing what had occurred.

Given the prior investigations, mental health and drug issues, and other factors, SSA determined Z.O.'s safety was at high risk and applied for a protective custody warrant on October 16, 2020. This was granted and Z.O. was placed in foster care on October 17, 2020. A dependency petition was filed on October 20, 2020, under Welfare and Institutions Code section 300, subdivisions (b)(1), (g) and (j).[2] A detention report was filed the same day. Because of previous referrals and the parents' failure to

---

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Section 300, subdivision (g) provides that the dependency court may take jurisdiction over a child when, inter alia, she "has been left without any provision for support [or] the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child."

4

reunify with their older child, SSA recommended Z.O. be detained, with the parents permitted monitored visits. SSA also requested the parents undergo regular drug testing.

Mother reported having Native American ancestry. She had family members from the Cherokee and Blackfeet tribes, but she herself was not a member. Father reported no Native American ancestry. However, in February 2013, a previous juvenile court had found the Indian Child Welfare Act (25 U.S.C.§ 1901 et seq.; ICWA) did not apply.

The initial detention hearing was held (via videoconference because of the COVID-19 pandemic) on October 23, 2020. Mother, who was still in custody, was present in lockup for the hearing but never actually appeared. Her appearance was waived by her appointed counsel. Counsel reported she might have Indian heritage through her father and sister.[3] The court ordered the child detained with mother permitted eight hours of monitored visitation per week, and also ordered SSA to continue investigating potential tribal membership. Findings under ICWA were deferred. A jurisdictional hearing was set for November 13, 2020.

In preparation for filing its jurisdiction/disposition report on November 6, 2020, SSA interviewed mother at the jail to allow her an opportunity to admit or deny the allegations in the dependency petition. In response to the allegation that she had unresolved mental health issues, mother gave a somewhat rambling response in which she expressed what appeared to be paranoid thoughts about others harassing or following her.[4] She also suggested she did not believe she did anything for which she should be

---

[3]Mother filled out and filed a parental notification of Indian status form (Judicial Council form ICWA-020) on the same date as the detention hearing, stating she believed her biological father and biological sisters had Cherokee and Blackfoot lineage.

[4]For instance, SSA's petition alleged mother had been diagnosed with anxiety and had been prescribed Paxil and Xanax, but when she attempted to discontinue the medication, she began "seeing shadows" and contacted law enforcement multiple times. She self-reported as much in 2009. But in her interview for the

criminally culpable: "No fire equals no arson equals no charges which equals no child endangerment." Mother had not been able to visit with Z.O. due to her incarceration, but she did sign her case plan, which, in part, required her to seek mental health counseling and take medications as prescribed.

Mother was not present for the jurisdictional hearing called on November 13, 2020, via videoconference, but she was represented by counsel. This attorney, Bianca Jimenez, had substituted in after mother's previous counsel declared a conflict. Because of the change, the juvenile court continued the matter to January 11, 2021. SSA was ordered to continue investigating possible Native American ancestry.

A few days after the November hearing, mother filed a letter with the court. The court scheduled a hearing to consider whether a GAL should be appointed for mother and ordered the letter sealed. After conducting a hearing, the transcript of which was also sealed, the court appointed a GAL on January 4, 2021.

From that time forward, the GAL and mother's appointed counsel made appearances on her behalf. When the jurisdictional hearing was held, the GAL submitted on mother's behalf and the petition was sustained. The matter was set for a dispositional hearing on March 18, 2021, which, again, mother did not attend. SSA sought a bypass of reunification services, while Attorney Jimenez sought to persuade the court that reunification would still be in Z.O.'s best interests. She explained to the court that mother had been ordered to the state hospital to receive mental health treatment and engage in sobriety with the goal of restoring her to competency. She also pointed out that mother could not easily respond or reach out to SSA due to COVID protocols in the jail system. The court set a selection and implementation hearing under section 366.26 for

---

jurisdictional/disposition report, she denied ever taking medication and blamed the previous dependency cases for any mental health issues. She also said the "shadows" she saw were made by her former boyfriend, Michael, whom she claimed was harassing her and breaking into her home.

6

July 15, 2021, and it ordered mother to be transported for the hearing. It declined to order reunification services for the parents and noted mother had been involuntarily hospitalized under a psychiatric hold.

An ICWA review took place on May 6, 2021, at which the GAL and mother's counsel appeared. The court found ICWA did not apply. Mother's GAL objected to the setting of a selection and implementation hearing.

SSA recommended that Z.O. be deemed adoptable, given that her foster family was willing to adopt her, and that mother and father's parental rights be terminated. While mother was ultimately present for the selection and implementation hearing, her parental rights were terminated and Z.O. was placed for adoption.

DISCUSSION

Mother challenges the termination of her parental rights on two grounds. First, she argues the trial court committed reversible error in appointing a GAL to represent her at the jurisdictional hearing onward. Second, she contends the juvenile court lacked substantial evidence to find the ICWA inapplicable to Z.O.'s case. We conclude reversal is required.

I. Guardian ad Litem

As a threshold matter, SSA contends mother waived her right to appeal the GAL appointment because she failed to take a writ from the order setting the selection and implementation hearing, which issued on March 19, 2021. The problem with this argument is that there is no evidence in the record that mother was ever notified that a GAL was appointed for her, prior to the selection and implementation hearing.

When the trial court set that hearing, it ordered the clerk to send notice to both parents of their right to appeal the setting order at their "last known address." The clerk's certificate of service indicates it and other prior orders were served on mother at a

7

residential address in Orange, California.  But this address was clearly no longer valid because mother was incarcerated at the time, and everyone, including the court, was aware of this.  Indeed, the juvenile court ordered mother to be transported for the selection and implementation hearing, demonstrating it knew she was still housed at Women's Central Jail.  Mother had not previously appeared for any hearing except the GAL hearing, and the court had never advised her it was sending notices to the Orange address.  Under these circumstances, there is good cause to consider her appeal despite the failure to appeal the setting order.  (See *In re A.A.* (2016) 243 Cal.App.4th 1220, 1241-1243; Cal. Rules of Court, rule 5.590(b).)

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court.  [Citations.]  The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case.  [Citations.]  The effect of the guardian ad litem's appointment is to transfer direction and control of the litigation from the parent to the guardian ad litem, who may waive the parent's right to a contested hearing.  [Citations.] [¶]  Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard.  [Citation.]  The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.]  If the parent consents to the appointment, the parent's due process rights are satisfied.  [Citation.]  A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent.  [Citation.]  If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*In re James F.* (2008) 42 Cal.4th 901, 910-911.)

8

Any "error in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding is trial error that is amenable to harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice." (*Id.* at p. 915.)

The substantial evidence standard requires that the juvenile court find by a preponderance of the evidence that a parent is incompetent under either Probate Code section 1801 or Penal Code section 1367. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 667 (*Sara D.*).) Penal Code section 1367 states: "A defendant is mentally incompetent for purposes of this chapter if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (*Id.,* subd. (a).) On appeal, we review the entirety of the record to determine if the circumstances reasonably justify the trial court's conclusions, even if we believe the circumstances might also "be reasonably reconciled with a contrary finding . . . ." (*In re George T.* (2004) 33 Cal.4th 620, 631.)

At the time it appointed a GAL for mother, the trial court made no explicit finding of incompetence on the record. This was error. (See *In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1188 ["The court's decision on this issue should be stated on the record"].)

What record we do have is difficult to parse. We have reviewed the sealed portions of the record, which contains relevant information. But even having done so, we cannot find any clearly articulated basis for the appointment. Mother filed her letter in mid-November 2020. The court set the GAL hearing, and on January 4, 2021, it appointed the GAL. The minute order appointing the GAL was entered pursuant to a stipulation from the parties, and there were no appearances.

9

Later hearing transcripts indicate mother had been ordered by the criminal court to a state hospital under an involuntary psychiatric hold to receive mental health services with the goal of returning her to a competent position. The juvenile court acknowledged this state of affairs on the record, but never expanded on the point, and it did not make any competency findings.

We acknowledge that mother's hospitalization is a potential indicator of incompetence. As Division One of our court found some years ago, a parent's hospitalization for severe mental illness can serve as a basis for finding any procedural error in appointing a GAL harmless beyond a reasonable doubt. (See *In re Daniel S.* (2004) 115 Cal.App.4th 903, 914.) But hospitalization alone is insufficient. In *In re Daniel S.*, the panel had been presented with extensive evidence that the parent in question was unstable and unable to effectively participate in the proceedings. (*Id.* at p. 914.) Medical staff at the psychiatric facility would not even allow her to attend hearings because she posed a danger to herself and others. (*Id.* at pp. 908-909.) Here, we have no such evidence.

Indeed, we have no idea of the condition mother was in when sent to the hospital. We have evidence of neither a diagnosis nor a prognosis. When it made its final ruling on the GAL motion, the juvenile court did not state whether it had received, reviewed, or relied on the psychiatric evaluations from mother's criminal case. It did not include any such reports in the sealed portion of the record. We are thus left to speculate as to what those reports might have said. The omission of any findings on competency violated mother's due process right to understand the reasons for the GAL appointment, especially in light of the court's disinclination to appoint one at first. The lack of findings deprived mother of the ability to mount an effective appeal of the ruling.

We are unable to conclude this error was harmless. We have no information on mother's condition during the time the jurisdictional, dispositional, and selection and implementation hearings were taking place. We do not know what

10

evidence or testimony she might have presented. The GAL appears to have submitted on SSA's dependency petition and objected to the setting of the section 366.26 hearing. But would the result have been different if mother had been permitted to appear herself? We simply do not know the answer. Mother was almost completely eliminated from the proceedings, first through waivers of her appearances at hearings and then through the GAL appointment.[5]

## II. ICWA

Mother also takes issue with the trial court's findings regarding ICWA. In any juvenile dependency proceeding, both the trial court and SSA have "an affirmative and continuing duty to inquire" whether a child "is or may be an Indian child" covered by ICWA. (§ 224.2, subd. (a).) Notice is to be given to any tribes of which the child may be a member so that they may intervene if appropriate. (§ 224.3.) "ICWA's notice requirements serve two purposes. First, they facilitate a determination of whether the child is an Indian child under ICWA. (25 U.S.C. § 1903(4) [defining Indian child as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe'].)" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*).) "Second, ICWA notice ensures that an Indian tribe is aware of its right to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding involving an Indian child." (*Ibid.*)

---

[5]We are somewhat concerned at the amount of times mother's appearance was waived at hearings by her counsel. There does not appear to have been much inquiry by the trial court as to the reasons why mother could not appear. As she was in custody throughout the pendency of the case, we are puzzled as to why her appearance could not be obtained prior to the section 366.26 hearing. We wish to underscore the need for trial courts to make sufficient inquiry of counsel to satisfy themselves that parents have indeed waived their right to appear at important hearings.

"If a court determines it has reason to know a child is an Indian child, the court must notify the [Bureau of Indian Affairs] and any relevant tribe so that the tribe may determine the child's status and decide whether to intervene. [Citation.] If adequate and proper notice has been given, and if neither the [Bureau of Indian Affairs] nor any tribe provides a determinative response within 60 days, then the court may determine that ICWA does not apply to the proceedings. [Citation.] At that point, the court is relieved of its duties of inquiry and notice [citation], unless the [Bureau of Indian Affairs] or a tribe subsequently confirms that the child is an Indian child [citation]." (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 14-15.) "Importantly, '[t]he relevant question is not whether the evidence . . . supports a finding that the minor[] [is an] Indian child[]; it is whether the evidence triggers the notice requirement of ICWA so that the tribes themselves may make that determination.' [Citation.] After proper notice has been given, if the tribes respond that the minor is not a member or not eligible for membership, or if neither the [Bureau of Indian Affairs] nor any tribe provides a determinative response within 60 days, then the court may find that ICWA does not apply to the proceedings. At that point, the court is relieved of its duties of inquiry and notice unless the [Bureau of Indian Affairs] or a tribe subsequently confirms that the child is an Indian child." (*Id.* at p. 15.)

Based on mother's reported Native American ancestry, SSA interviewed her sister, stepmother, and father. Mother's father had claimed Blackfeet heritage through his mother and unknown tribal heritage through his father. Utilizing the information gleaned from the interviews and public resources, SSA was able to reach out to four tribes to seek information on Z.O.'s potential status as an Indian child: Cherokee Nation, United Keetoowah Band of Cherokee Indians in Oklahoma, Eastern Band of Cherokee Indians, and Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. By the time SSA filed its addendum report in January 2021, only the Cherokee Nation had responded, saying, based on the information it had, Z.O. was not an Indian child. But by April 29, 2021, SSA reported it had received responses back from all four tribes that

12

Z.O. was not eligible for ICWA status. On the basis of this report, the juvenile court ruled, on May 6, 2021, that ICWA did not apply to the matter.

Mother contends the juvenile court's finding was not supported by substantial evidence because the SSA reports do not contain copies of the actual correspondence exchanged with or received from the tribes. She also notes SSA did not say which family tree or other biographical information it provided to the tribes to ensure accurate information was provided.

"Where the record shows unequivocally that proper notice was given to the proper tribes and that responses were received, and the *only* omission is the failure to file a proof of service establishing that the notice and a copy of the petition were sent by certified mail, error will not be presumed and compliance will be deemed sufficient." (*In re Elizabeth W.* (2004) 120 Cal.App.4th 900, 907.) Here, the reports indicated the tribes responded to the notice in the negative, but the actual responses and communications themselves were not included.

The entire judgment must therefore be reversed and remanded so the errors noted in this opinion may be corrected. We understand that our disposition of this appeal is likely, and regrettably, to create newfound uncertainty for Z.O., who is now nearly six years old and was deemed adoptable by her foster family. Should the trial court determine a new GAL hearing on mother's competency is required, we believe it should be done with utmost urgency in protection of the child's well-being and stability.

DISPOSITION

The judgment is reversed and remanded with the instruction that the trial court expeditiously hold proceedings and/or make findings regarding the need, or lack thereof, of a GAL for mother, and order SSA to supplement its ICWA investigation reports to include correspondence with the noticed tribes.


SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

Filed 5/24/22

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Z.O., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>C.O.,<br><br>    Defendant and Appellant. | G060663<br><br>(Super. Ct. No. 20DP1345)<br><br>ORDER MODIFYING OPINION; DENYING PETITION FOR REHEARING; AND CERTIFYING FOR PARTIAL PUBLICATION<br><br>[CHANGE IN JUDGMENT] |

It is hereby ordered that the opinion filed on April 27, 2022, be modified as follows:

1. In the editorial paragraph on page 1, second sentence, the word "Reversed" is deleted and replaced with "Conditionally affirmed" so that the sentence reads:

Conditionally affirmed and remanded with instructions.

---

<sup>*</sup>    Sections designated not published are listed within this order.

2. On page 2, first full paragraph under the "INTRODUCTION" section, delete the last sentence beginning "Rarely do we . . . ."

3. On page 3, lines 8 and 9 from the top of the page, delete "reverse the judgment and" so that the sentence reads:

And as a result, we must remand for further proceedings.

4. On page 7, last sentence in the first full paragraph in the "DISCUSSION" section, replace the word "reversal" with "conditional affirmance" so that the sentence reads:

We conclude conditional affirmance is required.

5. On page 13, third full paragraph, first sentence, replace the words "entire judgment" with the word "matter" and in the same sentence delete "reversed and" so that the sentence reads:

The matter must therefore be remanded so the errors noted in this opinion may be corrected.

6. On page 14, delete the entire paragraph under the "DISPOSITION" section, and replace it with the following paragraph:

The judgment is conditionally affirmed and remanded with the instruction that the trial court expeditiously hold proceedings and/or make findings regarding the need, or lack thereof, of a GAL for mother as of the time the GAL was originally appointed, and order SSA to supplement its ICWA investigation reports to include correspondence with the noticed tribes. After doing so, should the trial court make express findings that a GAL was required at the time of the appointment, and should it find ICWA inapplicable, our affirmance resolves the case.

2

These modifications change the judgment.

Respondent's petition for rehearing is DENIED.

Appellant requested that our opinion in the above-entitled matter filed on April 27, 2022, be certified for publication in the Official Reports. For good cause, it now appears that portions of the nonpublished opinion meet the standards for publication specified in California Rules of Court, rule 8.1105. It is ORDERED that the opinion, as so modified above, be certified for partial publication in the Official Reports. The portions of the modified opinion to be excluded from publication are as follows:

The first full paragraph on page 5, beginning with "Mother reported having . . . ."

On page 5, second full paragraph beginning with "The initial detention," exclude the fourth, fifth, sixth, and seventh sentences and footnote 3.

On page 6, first full paragraph, exclude the last sentence beginning "SSA was ordered . . . ."

On page 7, exclude the first full paragraph beginning with "An ICWA review . . . ."

On page 7, the first full paragraph under the "DISCUSSION" section, exclude the third sentence beginning with "Second, she contends . . . ."

Exclude all of part II of the "DISCUSSION" section beginning on page 11 and ending on page 13 except for the final paragraph of part II located on page 13.

3

Under the "DISPOSITION" section, on page 14, in the newly inserted paragraph, exclude the phrase "and order SSA" and all the words after that phrase in that sentence.

Under the "DISPOSITION" section, on page 14, in the newly inserted paragraph, exclude the words "and should it find ICWA inapplicable" from the last sentence in the paragraph.

SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

4