Filed 4/17/23  In re C.G. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.G., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, | A165310 |
| Plaintiff and Respondent, | |
| v. | (Contra Costa County Super. Ct. No. J1800946) |
| Y.G., | |
| Defendant and Appellant. | |

Y.G. (Mother) appeals from an order terminating her parental rights and finding her eight-year-old daughter C.G. adoptable.  She contends reversal is required because (1) the court erred when it appointed a guardian ad litem for her, and (2) the Contra Costa County Children and Family Services Bureau (the Bureau) failed to comply with its duty of inquiry under California law implementing the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).  We disagree.  The court properly appointed a guardian ad litem based on Mother's informed consent and substantial evidence, while the Bureau's conceded failure to conduct the required inquiry was harmless.  Accordingly, we affirm.

1

## BACKGROUND

This child dependency case was initiated in October 2018, when C.G.'s older half-sister, Marilyn, reported that C.G.'s father (Father) sexually abused her from when she was 10 years old until she was 16. The Bureau detained C.G. and filed a dependency petition under Welfare and Institutions Code section 300[1] that, as amended, alleged Father sexually abused Marilyn; that C.G. was at risk of similar abuse; and that Mother failed to protect C.G. from abuse or, due to her history of homelessness and mental illness, to provide adequate care for her. Father was charged with multiple felony accounts, and ultimately convicted and sentenced to a 20-year prison term.

Mother had seven prior child welfare referrals, four of which resulted in investigations. She was chronically homeless and lived on the streets. According to Father, her mental illness prevented her from taking care of the girls.

Father, who had two other children in Brazil, had been granted full custody of C.G. when she was eight months old. In 2012, when C.G. was about two years old, the Bureau received a referral alleging Mother had been placed on an emergency psychiatric hold after physically attacking Marilyn during a visit. Marilyn was placed in foster care with and later adopted by Father. Mother's parental rights to her were terminated in 2016 after reunification efforts failed.

Mother told the social worker she lost custody of Marilyn because she was homeless and on the streets, mentally and physically sick, and experiencing disorientation and depression. After that she spent about a year in New York, where she had family. According to the social worker, however, Mother might

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

have been in New York for anywhere from seven months to two years.

Mother returned to California and moved into Father's home about eight months before the events that triggered the current dependency action. Father reported that she was physically violent with the girls and caused "many problems." Their relationship was " 'very bad;' " Mother was very temperamental and sometimes mean. Her mental illness prevented her from taking care of the girls.

In November 2018, C.G. was detained in foster care. According to the Bureau's report for the jurisdiction and disposition hearing, Mother was born in Guatemala and immigrated to the United States in 2003. She reported having no American Indian ancestry and completed an ICWA-020 form to that effect. Father was born in Brazil. He has a brother and sister-in-law who live in Richmond and speak primarily Portuguese. Father also submitted a form stating he had no American Indian ancestry.

Mother had a history of visual hallucinations and had been prescribed a medication used to treat schizophrenia. During the current proceedings, she told the social worker she was being treated at a mental health clinic, but the doctor she identified had no knowledge of her. Mother said she was taking a medication used for nerve pain, depression, and anxiety, but also that she never had a mental health diagnosis.

The social worker had difficulty assessing Mother because she was inaccurate, confused details, and was unable to stay on topic. "While it is unclear what [her] diagnosis is, it is clear she has a developmental or mental illness that hinders her ability to convey succinct facts about her ability to parent, and hinders her ability to safely parent [C.G.] at this time."

At the jurisdiction and disposition hearing, Mother submitted to the allegation that she had failed to adequately care for C.G. due to her history of homelessness and mental illness. Father submitted to the sexual abuse of sibling allegation. The court declared C.G. a dependent child, ordered her removed from both parents, and granted Mother (but not Father) reunification services and visitation.

At the six-month review hearing, the court continued C.G.'s out-of-home placement and extended Mother's reunification services for six more months.

The 12-month review hearing took place on March 2, 2020. According to the Bureau's reports, Mother continued to minimize Marilyn's sexual abuse and its effect on her ability to reunify with C.G. Mother alternated between denying the abuse occurred, blaming Marilyn for initiating it, and accusing her of making it up. Mother described Father as " '[n]ot a bad guy' " and told the social worker she would release him from jail if she could.

Mother became emotional when the social worker asked about her living situation, pleaded for C.G.'s return, and became angry when the social worker discussed plans for her daughter. She had completed a parenting class and said she was attending therapy and taking her medications, but she was unable or unwilling to provide her psychiatrist's name or identify her prescriptions. She was visiting C.G. regularly.

The social worker testified that Mother became highly emotional during their meetings. When the discussion turned to the sexual abuse and its impact on the Bureau's recommendations for C.G., she would refuse to answer questions and "shut the meeting down." Mother continued to blame Marilyn for any abuse that occurred, accused her of making up the allegations, and lacked any insight into what she would do if

4

C.G. reported being sexually abused. If that were to occur, the social worker did not believe Mother would protect the minor.

The juvenile court found there was no reasonable likelihood Mother would be able to reunify with C.G. if provided six additional months of services; that Mother had not made any progress in addressing the mental health conditions that led to the sustained allegation; that returning C.G. to her custody would create a substantial risk of harm; and that the Bureau had provided reasonable reunification services. The court terminated reunification services, found by clear and convincing evidence that a section 366.26 hearing was not in C.G.'s best interest, and scheduled a permanent plan review hearing.

That hearing took place on May 3, 2021. By that time, the Bureau had changed its recommendation to adoption by C.G.'s current foster parents. The social worker had recently suspended Mother's phone contact with C.G. due to inappropriate comments (including that Mother was homeless and that they would move to her home in Guatemala when C.G. came back to her), late night telephone calls, and incessant text messages. Mother continued to tell the social worker she was " 'not understanding' the court process" and believed the social worker had "set a trap." She was unable to follow when the social worker explained the case status and maintained that the social worker and foster parents were plotting against her.

C.G. wanted to be adopted by her foster parents. She was worried Mother would keep the adoption from going through and did not want any contact with her until Mother got help with her mental health. She explained, " 'I just need a break. She is not crazy, but she is crazy in a not normal way and I just need a break. Yes, I need a break from her.' " Mother continued to deny the sexual abuse allegations and to blame Marilyn.

At the outset of the hearing, Mother's attorney moved under *People v. McKenzie* (1983) 34 Cal.3d 616 (*McKenzie*) for

permission to withdraw as counsel. Before addressing the request, the court questioned Mother about possible Native American status and found ICWA did not apply. It then proceeded to hold a hearing on the *McKenzie* request with only Mother, her attorney, a Spanish interpreter, and the court reporter present.

Counsel stated that communications had broken down between her and Mother and asked the court to allow her to withdraw from the case and to appoint substitute counsel and possibly a guardian ad litem. Mother had a guardian ad litem during a prior dependency action, but her attorney initially believed she did not need one for the current proceedings. Since then, however, counsel had changed her mind. Mother had been sending increasingly frequent ranting, angry texts at all hours accusing counsel of not helping her. Based on these interactions and information from the Bureau and county mental health services, counsel had come to believe that Mother now qualified for a guardian ad litem.

After further questioning by the court, counsel agreed to continue representing Mother and withdrew her *McKenzie* motion. When the hearing resumed in open court, the court turned to the question of appointing a guardian ad litem. It explained to Mother: "If I appoint a guardian ad litem, that means I would appoint someone to make all the decisions in the case for you. Instead of you telling the attorney what you want, the guardian will decide what is best for you and will tell the attorney. [Counsel] has requested this, because she feels that you do not understand what is going on in court, and you cannot assist her in making decisions about how to proceed in court."

The court then asked, "Would you in fact like me to appoint a guardian ad litem for you? That would be another attorney." Mother responded "Yes, your Honor. That will be fine. Thank you." The court stated "[Mother], we are going to get a guardian

ad litem appointed for you, as I just explained what that is. And I considered her responses, and I find, based on that response, that she does not understand the nature of the proceedings, or is not able to communicate. I am therefore going to send that referral over for a guardian ad litem."

The next permanent plan review hearing took place on March 14, 2022. Mother's attorney moved orally under section 388 to modify the order terminating reunification services on the ground that Mother was working with a housing program and had become sufficiently stable to better engage in reunification. Mother testified that she now believed Father had molested Marilyn and would believe C.G. were she to reported being sexually abused. Mother loved C.G. and believed C.G. needed her. She had not spoken with her daughter in a year and did not know why the Bureau had become involved.

The court denied the motion for modification, found the beneficial relationship exception to the preference for adoption did not apply, and found C.G. was likely to be adopted. Accordingly, it terminated Mother's parental rights.

## DISCUSSION

### A.

Mother contends the appointment of a guardian ad litem was unsupported by substantial evidence and violated her right to procedural due process. We disagree.

*In re James F.* (2008) 42 Cal.4th 901 states the controlling law. A guardian ad litem must be appointed if the parent lacks the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case. (*Id.* at p. 910.) The parent must be given an opportunity at an informal hearing to persuade the court the appointment is not necessary; the court must make sufficient inquiry to satisfy itself that the party is incompetent; court or counsel should explain the purpose

7

of the appointment and the grounds for believing the parent is mentally incompetent; and, *unless the parent consents to the appointment*, the record must contain substantial evidence of the parent's incompetence. (*Id.* at pp. 910-911.)

Here, Mother affirmatively consented to the appointment after the court explained the reason for and effect of appointing a guardian ad litem at the hearing. No more was required. In these circumstances, "[i]f the parent consents to the appointment, the parent's due process rights are satisfied." (*In re James F., supra,* 42 Cal.4th at p. 910; see also *In re Daniel S.* (2004) 115 Cal.App.4th 903, 912; *In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1187.)

Mother's contrary arguments are not persuasive. She suggests the court was required to question her about her mental capacity and ability to assist in her defense. We disagree. No law requires such questioning when the parent was afforded an opportunity to be heard and gave informed consent to the appointment of a guardian ad litem. [*Cf. In re Sara D.* (2001) 87 Cal.App.4th 661, 670-672 [appointment violated due process where attorney consented on parent's behalf outside of parent's presence, neither court nor counsel explained the purpose of or reason for a guardian ad litem, parent had no opportunity to respond, and court lacked sufficient information as to parent's competence].)

Mother's assertion that the court failed to inquire whether her attorney had discussed the implications of appointing a guardian ad litem with her is also meritless. Mother's experience having a guardian ad litem in a prior dependency case doubtless indicates some degree of familiarity with the implications of such an appointment. In this proceeding, the court explained to Mother that her counsel felt she did not understand the court proceedings and could not assist counsel in making decisions. It also explained that a guardian ad litem, if appointed, would make

all decisions about the case instead of Mother, and would relate them to her attorney. Nothing would have been gained by ascertaining whether Mother's attorney had provided the same advisements.

Mother also faults the court for suggesting the guardian ad litem would be an attorney. We have no reason to believe the person appointed to serve as guardian ad litem would *not* be an attorney. Nor is there any basis to find, as Mother contends, that she might have been led to misunderstand that the court was simply replacing her current attorney with new counsel. To the contrary, the trial court clearly explained that the guardian ad litem's role would be to decide what was best for Mother and to inform her attorney of those decisions. So advised, Mother consented to the appointment. There is no basis to presume she misunderstood what she was consenting too.

In any event, the decision to appoint a guardian ad litem would withstand review even without Mother's consent based on the substantial evidence that she was mentally incompetent to proceed without one. Mother has a long history of mental health problems that have prevented her from parenting her children, including hallucinations, erratic moods, and violent behavior resulting in a psychiatric hold. The social worker noted early in these proceedings that these problems prevented her from effectively communicating about her ability to parent. Later, in advance of the May 3 permanent planning review hearing, Mother told the social worker she did not understand the court process, did not understand why she could not reunify with C.G., and believed the social worker "set a trap" and did not want her to reunify. Each time the social worker attempted to explain the case status, Mother was unable to follow the conversation and maintained the social worker and foster parents were plotting against her.

9

At the *McKenzie* hearing, Mother's counsel reported she was unable to converse with Mother without her becoming upset and angry and using abusive language. Mother did not believe her attorney and did not believe counsel was doing anything for her. Despite her attorney's initial assessment, Mother's behavior and information from the Bureau and county mental health department had convinced her that a guardian ad litem was required.

In response to questioning by the court, Mother said that even with the help of a Spanish interpreter she had difficulty understanding her attorney. The court noted that Mother's responses showed she neither understood the nature of the proceedings nor was able to communicate with counsel. Substantial evidence supports the determination, so we will not disturb it.

**B.**

Mother asserts the court and Bureau failed to fulfill their duties to inquire into C.G.'s possible Native American lineage as required by California law implementing ICWA. The Bureau correctly acknowledges the error, but contends it was harmless. We agree.

ICWA establishes minimum standards for courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Under California's implementing legislation and rules of court, the juvenile court and the child welfare agency have an affirmative and continuing duty to inquire of all potentially interested persons whether a child for whom a dependency petition has been filed is or may be an Indian child. (§ 224.2, subds. (a), (b); Cal. Rules of Court, rule 5.481(a); *In re S.H.* (2022) 82 Cal.App.5th 166, 174.) This duty "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others

10

who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b); Cal. Rules of Court, rule 5.481(a)(1).)

The Bureau concedes it violated this duty of inquiry when it failed to ask Father's brother about possible Native American ancestry. Because the duty to inquire of a child's extended family members is imposed by California law, the error is reversible only if it was prejudicial. (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 433 (*Antonio R.*).)

The appellate courts are presently divided on what showing of prejudice warrants reversal for ICWA inquiry errors (see *Antonio R., supra,* 76 Cal.App.5th at p. 435); the issue is currently pending in Supreme Court. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578.) For present purposes, we will accede to Mother's request to follow the relatively strict standard stated in *Antonio R.*

Rejecting approaches taken by other courts that require some affirmative showing of prejudice to support reversal, *Antonio R.* held that "in determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian child." (*Antonio R., supra,* 76 Cal. App.5th at p. 435; compare, e.g., *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 [reversal required where record indicates there was readily obtainable information likely to bear meaningfully upon whether child is an Indian child]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 [reversal required where parent shows that, if asked, he or she would in good faith have claimed Native American ancestry].)

It may be, as *Antonio R.* predicts, that error will in most circumstances be prejudicial under its test. (*Antonio R., supra,*

76 Cal.App.5th at p. 435.)  But not so here.  A child is an Indian child if and only if he or she "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); see also Welf. & Inst. Code, § 224.1, subd. (a).)  In this case, undisputed evidence established that Mother and Father are, respectively, from Guatemala and Brazil.  Under these circumstances the Bureau's inadequate inquiry could not conceivably have made a difference; there is no possibility that C.G. is or may be a Native American child or, accordingly, that questioning her extended family members would be "meaningful" in making that determination.  (See *Antonio R., supra,* 76 Cal. App.5th at p. 435.)  We are satisfied the ICWA error does not require conditional reversal for further inquiry.

## DISPOSITION

The order terminating Mother's parental rights is affirmed.

_____
BURNS, J.

We concur:

_____
JACKSON, P.J.

_____
LANGHORNE, J.*

A165310

---

* Judge of the Napa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13